**Randolph K. REEVES, Petitioner,**

v.

**Frank X. HOPKINS, Respondent.**

No. CV90–L–311.

United States District Court,
D. Nebraska.

May 14, 1996.

Paula Hutchinson, Paula Hutchinson Law Firm, Lincoln, NE, Dorothy Walker, Mowbray, Walker Law Firm, Lincoln, NE, for Petitioner.

J. Kirk Brown, Assistant Attorney General, Lincoln, NE, for Respondent.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This habeas corpus case involving the death penalty is before me upon the decision of the United States Court of Appeals for the Eighth Circuit, *Reeves v. Hopkins*, 76 F.3d 1424 (8th Cir.1996) [hereinafter *Reeves V*], reversing in part this court's opinion in *Reeves v. Hopkins*, 871 F.Supp. 1182 (D.Neb. 1994) [hereinafter *Reeves IV*], and remanding for further proceedings.[1]

---

1. The following opinions of the Nebraska Supreme Court are also relevant to this case: *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433, *cert. denied*, 469 U.S. 1028, 105 S.Ct. 447, 83 L.Ed.2d 372 (1984) [hereinafter *Reeves I*]; *State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359, *cert. granted, judgment vacated*, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 409 (1990) [hereinafter *Reeves II*];

## I. BACKGROUND

Reeves's case is unique. It became unusual when the United States Supreme Court vacated the postconviction judgment of the Nebraska Supreme Court. In Reeves's prior direct appeal, as well as in a prior postconviction appeal, the state appellate court implied that a state appellate court could reimpose the death penalty even if the trial court engaged in harmful error during sentencing.

The Supreme Court remanded the *Reeves* case to the state appellate court to explicitly determine whether state law allowed an appellate court to sentence. As a result of that remand, the Nebraska Supreme Court announced for the first time that it had the power to impose the death penalty on its own even where there was harmful error in the sentencing decision at the trial level. This appellate sentencing mechanism would be used instead of sending the case back to the lower court for resentencing. The court also announced the standard it would use and the record it would review for purposes of imposing the death penalty.

At the same time the court announced its landmark ruling, it applied the ruling to Reeves. The court conducted a new examination of the record and sentenced Reeves to death.

Based on *Rust v. Hopkins,* 984 F.2d 1486 (8th Cir.), *cert. denied,* 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993), and a review of Nebraska law, I concluded in *Reeves IV,* 871 F.Supp. at 1192–1202, that the Nebraska Supreme Court violated Reeves's constitutional right to due process of law when it sentenced him to death, thus entitling Reeves to resentencing.

I reached this conclusion for two related reasons. *Id.* at 1194. First, I found that Reeves was entitled to habeas relief because the Nebraska Supreme Court had misapplied *federal law* as providing a source of power for a state appellate court to impose the death penalty. *Id.* at 1194–95 (pt. IIA1), 1202 (pt. D, finding & conclusion 3) (misapplication of federal law). Moreover, I believed

Reeves was entitled to relief because when it imposed the death penalty, the Nebraska Supreme Court deprived *Reeves* of certain state statutory rights (state-created liberty interests) regarding the manner in which death sentences must be imposed under state law. By failing to follow these state statutes, the Nebraska Supreme Court violated *federal* due process of law standards under the Fourteenth Amendment since the court deprived Reeves of his state-created liberty interests without authority under local law. *Id.* at 1194–99 (pt. IIA1(a)–(c)), 1202 (pt. D, findings & conclusions 1, 5) (deprivation of state-created liberty interests).

In addition, I agreed with the recommendation of United States Magistrate Judge David L. Piester that the court should not reach certain claims. *Id.* at 1193 n. 11. As a result, I did not reach the question of whether Reeves had been denied notice and an opportunity to be heard before the Nebraska Supreme Court sentenced him to death in *Reeves III.*

The majority in *Reeves V* found that I erred in granting the writ because "[t]he Nebraska Supreme Court is the final arbiter of Nebraska law" and by "performing an exhaustive review of Nebraska statutory law in an attempt to show the Nebraska Supreme Court the inadequacy of its interpretation of its own authority under its own law, the district court exceeded the bounds of federal court authority." *Reeves V,* 76 F.3d at 1427. The *Reeves V* majority stated that the Nebraska Supreme Court had asserted the power to sentence. In the view of the majority, this assertion of power was a sufficient pronouncement of state law to preclude federal court review.

In its opinion reversing and remanding, the Eighth Circuit Court of Appeals stated: "Because of its application of *Rust,* the district court did not consider all matters raised by Reeves. . . . [W]e return this case with instructions to consider and decide all issues raised but not addressed by the district court." *Reeves V,* 76 F.3d at 1430–31. The issues raised but not addressed by this court

---

*State v. Reeves,* 239 Neb. 419, 476 N.W.2d 829 (1991), *cert. denied,* 506 U.S. 837, 113 S.Ct. 114,

121 L.Ed.2d 71 (1992) [hereinafter *Reeves III* ].

are issues 5, 6, 26, 27, 34, 36, and 38. *Reeves IV,* 871 F.Supp. at 1193 n. 11. Specifically, the following issues remain to be addressed on remand:

(5) Aggravating factor "(1)(d)" (Neb.Rev. Stat. § 29–2523(1)(d) "especially heinous, atrocious, cruel, or manifest exceptional depravity by ordinary standards of morality and intelligence") is unconstitutionally vague.

(6) Aggravating factor "(1)(b)" (Neb.Rev. Stat. § 29–2523(1)(b) "apparent effort to conceal the commission of a crime, or the identity of the perpetrator") is unconstitutionally vague.

(26) Presentence investigation report contained uncounseled statements Petitioner gave to a probation officer.

(27) Presentence investigation report contained unreliable and inaccurate information, was racially biased, and contained hearsay and speculative statements.

(34) On remand the Nebraska Supreme Court denied Petitioner notice and an opportunity to be heard.

(36) On remand the Nebraska Supreme Court improperly considered evidence of "inaccurate and unreliable allegations of unadjudicated misconduct."

(38) On remand the Nebraska Supreme Court applied the incorrect standard when it applied aggravating factor "(1)(d)" with regard to the death of Janet Mesner.

*See Reeves IV,* 871 F.Supp. at 1193 n. 11, 1212–13.

I will address each of these issues, but I shall not repeat the factual and procedural history of this case except as such facts are relevant to my discussion of each issue. *See Reeves IV,* 871 F.Supp. at 1186–1192 (factual and procedural history of case recited). I will also address Reeves's motion "to keep the record open." (Filing 144.)

Ultimately, I find and conclude that the petition should be granted because claim 34 is meritorious. I also find and conclude that the other claims do not entitle Reeves to relief. With regard to the motion to keep the record open, I find and conclude that I have no jurisdiction to grant the motion because the court of appeals retained jurisdiction in *Reeves V.* Therefore, I will deny the motion.

## II. DISCUSSION

I first address issue 34 since it is the most complex of the claims and an understanding of issue 34 provides important context for a complete understanding of the remaining claims. I then turn to the remaining claims.

### A. Issue 34—Notice and Hearing [2]

Reeves claims the Nebraska Supreme Court violated his federal rights when it sentenced him to death in *Reeves III* without "notice and an opportunity to be heard." The sentence was pronounced after the United States Supreme Court vacated the prior Nebraska judgment and remanded the case to the Nebraska Supreme Court "for further consideration in light of *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)." *Reeves v. Nebraska,* 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 409 (1990).

Reeves argues that the Nebraska Supreme Court imposed the death penalty [3] after the remand and *then* told him what the rules were. Reeves believes such a decision violat-

---

**2.** Respondent does not claim that Reeves failed to exhaust this claim or that it is procedurally defaulted. (Resp't's Br.Remand at 17.) In fact Reeves explicitly raised this issue by filing a motion for stay of execution and stay of mandate that included a motion for reconsideration of *Reeves III.* (Filing 71, particularly second doc. blue binder at 3, ¶ 7 (Mot.Recons. attached to Mot.Stay) (raising claim that Nebraska Supreme Court denied Reeves due process when it sentenced him without notice and an opportunity to be heard).) The motion was filed seven days after *Reeves III* was issued. The Nebraska Su-

preme Court denied the motion without comment and issued its mandate. (Filing 94, at 32.)

**3.** Respondent expressly admits the Nebraska Supreme Court actually resentenced Reeves. *Reeves IV,* 871 F.Supp. at 1194 n. 12 (noting Respondent admitted that in *Reeves III* the Nebraska Supreme Court " 'resentenced Reeves to death for both of the homicides in question.' " (quoting Resp't's Br. Addressing First Am.Pet. at 2 (emphasis in original brief))).

ed his federal constitutional right to due process of law. I agree.

### 1. *"Due process" requires adequate notice and a meaningful opportunity to be heard.*

■ The Due Process Clause of the Fourteenth Amendment requires that a person subject to the death penalty be given adequate notice and a meaningful opportunity to be heard before he is sentenced to death by a state such as Nebraska. Specifically, a person who receives a death sentence must first be given notice that the death penalty may be imposed and then a fair opportunity to contest the imposition of the penalty before it is pronounced. *Lankford v. Idaho,* 500 U.S. 110, 126–27 & n. 22, 111 S.Ct. 1723, 1732–33 & n. 22, 114 L.Ed.2d 173 (1991) (sentencing process violated Due Process Clause of the Fourteenth Amendment because at the time of the sentencing hearing, Lankford and his counsel did not have adequate notice that the judge might sentence him to death, given the prosecutor's failure to request the death penalty). *See also Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (petitioner denied due process of law when death sentence imposed, at least in part, on the basis of information contained in a presentence report that he had no opportunity to deny or explain).

■ In *Lankford,* the Supreme Court found a long history of precedent to support these elemental precepts. The Court described that history this way:

Baldwin v. Hale, 1 Wall. 223, 233 [17 L.Ed. 531] (1864) ("Common justice requires that no man shall be condemned in his person or property without notice and an opportunity to make his defense"); *In re Oliver,* 333 U.S. 257, 273 [68 S.Ct. 499, 507–08, 92 L.Ed. 682] (1948) (due process requires that a person be given "reasonable notice of a charge against him, and an opportunity to be heard in his defense ... to examine the witnesses against him, to offer testimony, and to be represented by counsel"). *In a variety of contexts, our cases have repeatedly emphasized the importance of giving the parties sufficient notice to enable them to identify the issues*

*on which a decision may turn.* See, *e.g., Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 [70 S.Ct. 652, 657, 94 L.Ed. 865] (1950) (notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); *Armstrong v. Manzo,* 380 U.S. 545, 549–550 [85 S.Ct. 1187, 1190–91, 14 L.Ed.2d 62] (1965) (failure to notify petitioner of pendency of adoption proceedings deprived him of due process of law); *Goss v. Lopez,* 419 U.S. 565, 579 [95 S.Ct. 729, 738–39, 42 L.Ed.2d 725] (1975) ("students facing suspension ... must be given *some* kind of notice and afforded *some* kind of hearing"); *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 546 [105 S.Ct. 1487, 1495, 84 L.Ed.2d 494] (1985) ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story"). *In the capital context, in which the threatened loss is so severe, the need for notice is even more pronounced.*

500 U.S. at 126 n. 22, 111 S.Ct. at 1732 n. 22 (emphasis added).

■ As the Court cautioned in *Lankford,* without appropriate notice one lacks a meaningful opportunity to be heard:

Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure.

Without such notice, the Court is denied the benefit of the adversary process.... If notice is not given, and the adversary process is not permitted to function properly, there is an increased chance of error, and with that, the possibility of an incorrect result.

*Id.* at 126–27, 111 S.Ct. at 1733 (footnote and citations omitted).

■ These concepts compelled the *Lankford* court to conclude that where there was a "lack of adequate notice that the judge was contemplating the imposition of the death sentence," there was created "an impermissible risk that the adversary process may have malfunctioned." *Id.* at 127, 111 S.Ct. at 1733.

This case raises the question of whether such an "impermissible risk" was created by the manner in which the Nebraska appellate court gave (or did not give) Reeves notice and an opportunity to be heard before it pronounced his death sentence.

2. *The procedural history and factual background of this case establish that the Nebraska Supreme Court first adopted its rule on appellate sentencing in Reeves III; then, without notice to Reeves, the court applied that rule to him, at the same time sentencing him to death.*

Until the opinion in *Reeves III* was released, no one could have predicted the Nebraska Supreme Court would sentence someone to death. *Reeves III* first articulated the appellate resentencing rule and then applied it to Reeves at the same time it imposed the death penalty and stated the rule.

a. *Procedural History*

As described in my prior opinion which is the subject of this remand, Reeves commenced a state postconviction action after his conviction and death sentences were affirmed on direct appeal. *Reeves I*, 216 Neb. 206, 344 N.W.2d 433. The state district court denied the motion, and Reeves appealed. On March 16, 1990, the Nebraska Supreme Court again affirmed. *Reeves II*, 234 Neb. 711, 453 N.W.2d 359.

Reeves sought review of the Nebraska Supreme Court's decision in *Reeves II* in the United States Supreme Court. On November 13, 1990, the Supreme Court granted the petition for writ of certiorari, vacated the judgment of the Nebraska court, and "remanded to the Supreme Court of Nebraska for further consideration in light of *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)." *Reeves v. Nebraska*, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 409 (1990).

On December 4, 1990, the Nebraska Supreme Court set oral argument on the remand for January 10, 1991, and directed the parties to file simultaneous briefs by December 31, 1990, "covering the subject of the remand." (Filing 94, at 2; Evidentiary Hr'g Issue 34, Ex. 2.)[4] Upon a motion by Reeves's counsel, (Filing 94, at 3), the brief date was later extended to January 31, 1991. (*Id.* at 28–29.) Oral argument was continued until February 5, 1991. (*Id.* at 30, 32.)

Reeves filed three motions on January 31, 1991, requesting (1) advance notice if the Nebraska Supreme Court intended to engage in resentencing on appeal, together with a statement of the issues the court deemed relevant to reconsideration of sentencing matters, (*id.* at 19; Evidentiary Hr'g Issue 34, Ex. 5); (2) an evidentiary hearing "at which time the Appellant can offer such evidence as he may have relevant and material to his resentencing, and upon such proper and adequate notice as would permit the Appellant and his counsel to adequately prepare for said hearing," (Filing 94, at 22; Evidentiary Hr'g Issue 34, Ex. 6); and (3) an order pursuant to Neb.Rev.Stat. § 29–2521 setting forth "a general order of procedure," (Filing 94, at 23; Evidentiary Hr'g Issue 34, Ex. 4). The Nebraska Supreme Court denied all three of Reeves's motions without explanation on February 1, 1991. (Filing 94, at 30, 32.)

Reeves's counsel also requested additional time for oral argument, suggesting that counsel needed at least 20 minutes, (*id.* at 16; Evidentiary Hr'g Issue 34, Ex. 3), and the parties were given 20 minutes for oral argument per side. (Filing 94, at 30, 33.) Oral argument took place on February 5, 1991. (*Id.* at 32.) No transcript of the oral argument before the Nebraska Supreme Court exists. (Filing 74.)

On November 8, 1991, the Nebraska Supreme Court issued its opinion in *Reeves III*, 239 Neb. 419, 476 N.W.2d 829. Although tedious, a very careful examination of *Reeves*

**4.** This citation refers to the evidentiary hearing regarding issue 34 held on February 22, 1996, and March 18, 1996. Documentary evidence received at that hearing was already contained in the record of this case, but was presented and received for the convenience of the court and counsel. (Evidentiary Hr'g Issue 34, Vol. I, at 9:12–20.)

III[5] is required to understand Reeves's claim 34:

1. The court first stated it had three options under *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), given the fact that "there has been an error concerning the trial court's finding of aggravating and/or mitigating circumstances": (a) re-examine and reweigh the evidence itself, (b) conduct harmless-error analysis, or (c) remand for a new sentencing hearing.

*Reeves III,* 239 Neb. at 423, 476 N.W.2d at 834.

2. The court next stated its understanding of *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), which was that appellate resentencing was only appropriate when such resentencing was "done independently" by the appellate court.

*Reeves III,* 239 Neb. at 423–24, 476 N.W.2d at 834–35.

3. The court then examined what it had done in other death-penalty cases subsequent to *Clemons:*

a. Without citing *Clemons,* the court affirmed the sentencing panel in a direct appeal case, but also reweighed after giving a limiting construction to an aggravating circumstance, which decision was based upon "our own review of the record, as well as the conclusions of the three-judge panel," *Reeves III,* 239 Neb. at 425, 476 N.W.2d at 835 (discussing *State v. Victor,* 235 Neb. 770, 457 N.W.2d at 431 (1990)).

b. In a postconviction case, the court "summarily adopted the reweighing rule" mentioned in *Clemons,* remarking that in the process the court "relied on the findings of the sentencing panel in reweighing the aggravating and mitigat-

ing circumstances when affirming" the conviction. *Reeves III,* 239 Neb. at 425–26, 476 N.W.2d at 835 (discussing *State v. Otey,* 236 Neb. 915, 464 N.W.2d 352 (1991)).[6]

4. The court next proceeded to explicitly adopt for the first time what it understood the "rule in *Clemons*" to be, and then applied that rule to *Reeves:*

a. The rule was that when, as in the case of *Reeves,* an aggravating circumstance relied upon by the sentencing panel is invalidated by the appellate court and a mitigating circumstance found not to exist by the sentencing panel is found to exist by the appellate court, resentencing by the district court sentencing panel is unnecessary, *provided* the Nebraska Supreme Court found that the error was harmless beyond a reasonable doubt, *or* if the error was not harmless beyond a reasonable doubt, that the Nebraska Supreme Court, after engaging in *de novo examination* of the sentencing record and analysis of the mitigating and aggravating circumstances, *independently concluded* that the death penalty was nevertheless justified.

*Reeves III,* 239 Neb. at 426–27, 476 N.W.2d at 836 (emphasis added).

b. The court stated:

We apply the rule in *Clemons* and *independently* consider the circumstances of Reeves' case, rather than remand for a new sentencing hearing. *We henceforth* require our review under *Clemons* to include an *independent examination* of the trial record, the presentence investigation, and the findings of the sentencing panel in order to determine the existence or nonexistence of aggravating and mitigating circum-

---

**5.** Because the issues on remand are somewhat different, this examination is more extensive than my previous examination of *Reeves III* in *Reeves IV.*

**6.** While it is true that the *Otey* court relied upon *Clemons,* it is also true that its reliance was "summary," i.e., nothing more than a citation to the case. *Otey,* 236 Neb. at 927, 464 N.W.2d at 361. Moreover, before its "summary" reliance,

the Nebraska Supreme Court *first* held that the issue—whether the sentencing panel improperly failed to consider a mitigating circumstance because of improper consideration of charged, but not adjudicated, criminal conduct—was procedurally barred. *Id.,* 236 Neb. at 926–27, 464 N.W.2d at 360. Accordingly, the "summary" citation to the *Clemons* rule in *Otey* was unnecessary to a resolution of the case.

stances, as well as a reweighing of all the factors. See *Parker, supra.* We find this to be the most effective way in which to ensure individualized and fair determination of the propriety of the death sentence in each defendant's case.

*Id.,* 239 Neb. at 427, 476 N.W.2d at 836 (emphasis added).

c. Although elliptically, the Nebraska Supreme Court admitted this was a new rule. As the *Reeves III* court recognized, after *Clemons* the Nebraska court never engaged in a completely *"independent"* determination of whether the death sentence was appropriate (as opposed to reliance in whole or in part upon the sentencing panel's conclusions) where harmful error may have occurred before the sentencing panel. *Reeves III,* 239 Neb. at 424–27, 476 N.W.2d at 835–36 (*comparing* the direct appeal in *Victor,* where the appellate court relied on the sentencing panel's conclusions together with an appellate review of the trial record, *with* the second postconviction action in *Otey,* where the appellate court relied exclusively on the conclusions of the sentencing panel while noting that it had reviewed the trial record in a prior direct appeal).

5. Citing only *Clemons v. Mississippi* and *Parker v. Dugger,* the court relied exclusively upon federal law, not state law, for the authority to adopt and implement what it understood to be the *"Clemons* rule," stating:

[W]hen an appellate court invalidates one or more of the aggravating circumstances, or finds as a matter of law that any mitigating circumstance exists not considered by the sentencing panel in its balancing, the appellate court may, *consistent with the U.S. Constitution,* reweigh the remaining circumstances or conduct a harmless error analysis.

*Reeves III,* 239 Neb. at 426–27, 476 N.W.2d at 836 (emphasis added).

6. The court then proceeded to conduct "harmless-error" analysis and concluded that the sentencing panel's failure "to consider Reeves' intoxication as a mitigating factor," which the court had found to exist

in *Reeves I,* was *not* harmless beyond a reasonable doubt.

*Reeves III,* 239 Neb. at 427–28, 476 N.W.2d at 836–37.

7. The court next proceeded "to *independently* reweigh all the aggravating and mitigating circumstances to determine if the death penalty was an appropriate sentence in this case."

*Reeves III,* 239 Neb. at 428, 476 N.W.2d at 837 (emphasis added).

8. The court found:

a. The record established two statutory aggravating circumstances and one statutory mitigating circumstance in Mesner's death (the murder was "especially heinous," etc., Neb.Rev.Stat. § 29–2523(1)(d) (first prong), because of the great pain the victim suffered and because the murder was committed during the process of a sexual assault; because the murder was committed during the course of another killing (Lamm's), *id.* § 29–2523(1)(e); and because at the time of the offense, the defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the law was impaired by drug and alcohol use, *id.* § 29–2523(2)(g)).

*Reeves III,* 239 Neb. at 429–34, 476 N.W.2d at 838–40.

b. The record established two statutory aggravating circumstances and one statutory mitigating circumstance in Lamm's death (the murder was committed to conceal the identity of the perpetrator, Neb.Rev.Stat. § 29–2523(1)(b); the murder was committed during the course of another murder (Mesner's), *id.* § 29–2523(1)(e); and at the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or conform his conduct to the law was impaired by drug and alcohol use, *id.* § 29–2523(2)(g)).

*Reeves III,* 239 Neb. at 435–36, 476 N.W.2d at 840–41.

c. Evidence in the record of nonstatutory mitigating factors included: (1) the defendant was a passive, nonviolent person by character and history; (2) Reeves

was remorseful for the killings; and (3) according to "several" psychiatrists and psychologists, Reeves had amnesia concerning most of the events of March 29, 1980.

*Reeves III,* 239 Neb. at 436, 476 N.W.2d at 841.

9. The court ruled that the death penalty was appropriate for Reeves, stating in its "Conclusion":

We have balanced the aggravating and mitigating factors anew and have determined that the aggravating circumstances outweigh any statutory or non-statutory mitigating circumstances in this case. Reeves' murders of Mesner and Lamm were senseless and brutal, made more so by the fact that he was a relative and friend of Mesner's. The fact that he stabbed to death two women and sexually assaulted or attempted to sexually assault one of them for no apparent reason is not mitigated by his intoxication on the night of the murders. Reeves was found to be sane at the time of the murders. His impairment by drug and alcohol use did not diminish his capacity to intentionally locate and break into Mesner's house, sexually assault or attempt to sexually assault her, stab her, and then stab her houseguest to death. We do not consider Reeves' remorse, amnesia, usual nonviolent nature, or intoxication sufficient to excuse him from the death penalty. Sentences of death remain the appropriate penalties for Reeves.

*Reeves III,* 239 Neb. at 436–37, 476 N.W.2d at 841.

Without question, *Reeves III explicitly announced a new rule:*

*We henceforth* require our review under *Clemons* to include an *independent examination* of the trial record, the presentence investigation, and the findings of the sentencing panel in order to determine the existence or nonexistence of aggravating and mitigating circumstances, as well as a reweighing of all the factors.

*Id.,* 239 Neb. at 427, 476 N.W.2d at 836 (emphasis added).

The new rule meant that for the first time in the history of Nebraska law a Nebraska appellate court had explicitly stated that it would independently decide de novo whether to impose the death penalty, without reliance upon the sentencing panel's conclusions, based upon a foundation consisting of the trial record, the presentence investigation, and the findings of the sentencing panel. At the same time it announced the new rule, the *Reeves III* court applied the rule to Reeves, *Reeves III,* 239 Neb. at 428–37, 476 N.W.2d at 837–41, providing neither advance notice nor an opportunity to argue how the rule should be applied.

b. *Factual Background*

At the request of counsel, I held evidentiary hearings on February 22, 1996, and March 18, 1996, to allow counsel to present evidence relevant to the issue of whether the Nebraska Supreme Court denied Reeves notice and an opportunity to be heard after the remand from the United States Supreme Court described earlier.

During the hearings, Petitioner's counsel elicited testimony from Robert B. Creager, Reeves's counsel during the proceedings before the Nebraska Supreme Court on remand from the United States Supreme Court, and Respondent's counsel presented the testimony of Sharon Lindgren, formerly an assistant attorney general for the Nebraska Department of Justice who was Respondent's attorney during the same proceedings.

Although they had somewhat different views concerning how the Nebraska Supreme Court could or would proceed before *Reeves III* was argued and decided, the testimony of both lawyers confirms that no one expected the Nebraska Supreme Court to engage in de novo sentencing resulting in a new death sentence while at the same time deciding what to do in light of the remand from the United States Supreme Court.

i. *Testimony of Robert B. Creager* [7]

Mr. Creager was admitted to the bar in Nebraska in 1977, at which time he joined a

---

7. Before testifying, Mr. Creager requested leave to withdraw from this case. (Evidentiary Hr'g

predominantly criminal law practice where he performed criminal litigation and appellate work from the outset. Since 1977, Mr. Creager has been involved in at least one "significant" criminal case per year, with an emphasis in state postconviction law, including 12 homicide cases.

Reeves's was the first death-penalty case in which Mr. Creager participated, but he has worked on three others since then. By the time Mr. Creager represented Reeves in the Nebraska Supreme Court on remand from the United States Supreme Court, he had argued criminal cases in the Nebraska Supreme Court at least 25 times, had acquired a fair amount of experience in state postconviction matters, and had participated in one capital sentencing proceeding at the trial level. (Evidentiary Hr'g Issue 34, Vol. I, at 5:9–12; 6:17–24; 52:3–11; 91:8–20; 93:6–24.)

Mr. Creager is on the board of directors of the Nebraska Criminal Defense Attorneys Association, has written material on state postconviction law for the *Nebraska Death Penalty Manual* and a habeas corpus publication, and has lectured to state district judges on proper procedure in capital cases. (*Id.* at 92:20–93:5.)

Mr. Creager was not Reeves's trial counsel. He was appointed to represent Reeves as appellate counsel long after Reeves had been tried, convicted, and sentenced and after Reeves had lost his state postconviction action at the district-court level. Creager began representing Reeves in 1988 when a member of his firm was appointed substitute counsel on Reeves's appeal of the Lancaster County District Court's decision denying his motion for postconviction relief. (*Id.* at 5:18–6:5; 6:15–16.)

After the Nebraska Supreme Court affirmed the denial of postconviction relief in *Reeves II*, Mr. Creager moved for rehearing in light of recent substantive changes in the

Issue 34, Vol. I, at 3:10–19.) On August 11, 1993, upon the motion of Reeves's attorneys, (Filing 44), Magistrate Judge Piester had appointed Mr. Creager temporary co-counsel for no more than 20 hours. (Filing 46.) Counsel having made no objection, I granted Mr. Creager's request to withdraw. (Evidentiary Hr'g Issue 34, Vol. I, at 3:20–23.)

law, among them the decision of the United States Supreme Court in *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). The Nebraska Supreme Court denied the motion for rehearing. (Evidentiary Hr'g Issue 34, Vol. I, at 7:9–24.)

As described in the procedural history, Mr. Creager then filed a successful petition for writ of certiorari in the United States Supreme Court. The Court vacated the judgment of the Nebraska Supreme Court and "remanded to the Supreme Court of Nebraska for further consideration in light of *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990)." *Reeves v. Nebraska*, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 409 (1990). In his petition for writ of certiorari, Mr. Creager raised the issue of whether the Nebraska Supreme Court, on appeal after finding sentencing error, could constitutionally affirm a sentence without finding harmless error, without engaging in a reweighing of the aggravating and mitigating circumstances, or without ordering resentencing. (Evidentiary Hr'g Issue 34, Vol. I, at 66:5–20.) At the time of the United States Supreme Court's remand order, Mr. Creager understood the impact of *Clemons* on Reeves's case to be uncertain. (Evidentiary Hr'g Issue 34, Vol. I, at 13:23–25.)

My recollection [of *Clemons v. Mississippi*] was that based upon some of the peculiarities of Mississippi law, they decided that although it was not [c]onstitutionally required [ ] that all sentencing error resulted in a new sentence ... that the states could fashion some sort of appellate resentencing ... *if they were capable of doing so,* to resolve the question.... [I]f you were a weighing state, ... [the court] had to say what the weight ... or the individualized sentence would be in that particular case, and ... *whether they are*

Reeves's counsel also waived the attorney-client privilege with regard to Mr. Creager's appearance before the Nebraska Supreme Court, including testimony related to his preparation for that appearance, his mental processes, and communications with his client. (*Id.* at 3:24–4:23.)

*authorized to do it[ ] will have to be decided on a case-by-case basis.*

(*Id.* at 13:2–18 (emphasis added).)

Mr. Creager understood Nebraska to be a "unique weighing state." (*Id.* at 69:19–24.) "I felt *Clemons* meant that the Nebraska Supreme Court can't do what it did in *Reeves* in total." (*Id.* at 72:14–15.) The "only thing" clear to Mr. Creager about the *Clemons* case was that affirming Reeves's convictions and death sentences in the context of an appellate proceeding was not constitutionally prohibited. (*Id.* at 73:4–11.)

Mr. Creager found the Nebraska Supreme Court's order directing the parties to file simultaneous briefs by December 31, 1990, "covering the subject of the remand," (Filing 94, at 2; Evidentiary Hr'g Issue 34, Ex. 2), vague and unusual for two reasons: (1) "in terms of what the Supreme Court thought *Clemons* meant and what we were supposed to brief ... I had no idea about"; and (2) in Mr. Creager's relatively substantial state and federal appellate court experience, he had never been asked to submit simultaneous briefs, and in lower courts where simultaneous briefs had been required, simultaneous reply briefs were also allowed. (Evidentiary Hr'g Issue 34, Vol. I, at 15:12–16:3.)

It occurred to Mr. Creager that the issue on remand might be whether the Nebraska Supreme Court could engage in harmless-error analysis or resentencing under *Clemons*. However, because the Nebraska statutes regarding sentencing in death-penalty cases related only to sentencing procedure to be followed in district courts, Mr. Creager filed three motions in an attempt to clarify whether the oral argument would actually be a sentencing proceeding. (*Id.* at 17:16–19:1.)

These motions requested (1) that since sentencing error occurred when Reeves's death sentence was imposed and the Nebraska Supreme Court was therefore required either to remand the matter to the district court or resentence Reeves itself, the court set a general order of procedure pursuant to Neb.Rev.Stat. § 29–2521 (Reissue 1989), which requires the court to set a general order of procedure at the outset of a sentence-determination proceeding relating to the death penalty, (*id.*, Ex. 4); (2) that the

Nebraska Supreme Court issue an order stating whether the court intended to engage in appellate resentencing, and if so, identifying the relevant sentencing issues, without which "Appellant and his counsel [ ] cannot adequately prepare for, brief, argue, or otherwise be heard with respect to resentencing issues," (*id.*, Ex. 5); and (3) that pursuant to Neb.Rev.Stat. § 29–2521, which allows presentation of evidence relevant to sentencing such as aggravating and mitigating circumstances, as well as argument for or against a death sentence, the Nebraska Supreme Court set an evidentiary hearing because "in the event [the Nebraska Supreme Court] undertakes to resentence Appellant, he should be given an opportunity to present additional evidence of mitigating circumstances together with briefs and arguments relating to the 'weight' of the various aggravating and mitigating circumstances found to exist" because the absence of such notice and hearing would violate Reeves's due process and equal protection rights. (*Id.*, Ex. 6.)

The Nebraska Supreme Court denied all three of these motions without explanation on February 1, 1991. (Filing 94, at 30, 32.) Mr. Creager construed the court's summary denial of his motions to mean that the court was going to remand the case to the district court and did not need to declare its intent to sentence or set a hearing and order of procedure; *or* that the court was going to "do nothing"; *or* that the court was going to act in some fashion that did not require an evidentiary hearing. (Evidentiary Hr'g Issue 34, Vol. I, at 19:17–20:2; 82:23–83:7.)

Realizing at this point that the Nebraska Supreme Court was not going to clarify the nature of the upcoming remand proceeding, Mr. Creager, "in an effort to try to provide some sort of effective representation to Mr. Reeves," contacted Assistant Attorney General Sharon Lindgren, thinking that "[m]aybe the lawyers could agree as to what was happening." (*Id.* at 21:10–20.) From his conversation with Ms. Lindgren, Mr. Creager understood the state's position to be that the Nebraska Supreme Court had *previously* performed a *"Clemons* reweighing" analysis in the decision that was eventually vacated by the United States Supreme

Court. Therefore, the Nebraska Supreme Court was required only to affirm. "Their position was . . . the remand really didn't say anything other than make sure you did it right when you affirmed it [before]. . . . [M]y state of mind at the time [was] that the Government was not really even arguing about what the appropriate sentence would be." (*Id.* at 21:20–23:23.)

Indeed, because Mr. Creager's involvement in Reeves's case was limited to issues related to evidentiary matters in the state postconviction proceeding, the notion that he was now Reeves's sentencing attorney and that he was engaged in some sort of sentencing process "never seriously crossed [Mr. Creager's] mind." (*Id.* at 26:25–27:23.) This conclusion was bolstered by the fact that (1) addressing such a sentencing issue via brief "did not seem appropriate to [him]," (*id.* at 27:19–28:1); (2) Mr. Creager was not aware of what aggravating and mitigating circumstances the Nebraska Supreme Court would consider so that he could argue their relative weight; (3) the court did not tell Mr. Creager whether it would permit submission of evidence relevant to a new proportionality review; (4) the court had not declared its intention to resentence Reeves; and (5) Reeves was not given an opportunity to be present. (*Id.* at 29:22–30:16.) Finally, having read *Clemons* and studied Nebraska's statutory sentencing scheme relative to death-penalty cases, Mr. Creager believed that if the Nebraska Supreme Court did not find harmless error, it would be required to remand the matter to the district court for resentencing. (*Id.* at 28:7–23.) However, he was uncertain about what the Nebraska Supreme Court felt was at issue:

> [W]hen the [Nebraska] Supreme Court asks me now to discuss the issues on remand, what I didn't know is whether they were asking me to tell them what *Clemons* said or whether they were asking me to tell them what they should do in light of *Clemons.*
>
> . . . .
>
> . . . [I]t wasn't just simply a matter of the implication of state law but the application of state law by the state Supreme Court, and I did not know and could not know how the Supreme Court was going to rule on that. If they ruled one way, none of this would have mattered. If they had simply said we remand to the district court, the discussion was over. If they went some other way into uncharted waters, I had no clue as to what Constitutional rights would be implicated. . . .

(*Id.* at 72:16–25; 74:9–18.)

Thus, Mr. Creager believed the purpose of oral argument to be a discussion about "whether we can do this," i.e., resentence Reeves at the appellate level in light of *Clemons* and Nebraska law. (*Id.* at 31:2–32:15.) "I was there to talk about the substance of what to do, not the substance of what the sentence should be." (*Id.* at 84:6–7.)

Mr. Creager "went to that oral argument as frustrated as I have ever been in any case I have ever had. . . . I certainly did not like the prospect of arguing a capital case to a Supreme Court in which I had no idea what I was arguing." (*Id.* at 33:23–34:6.) Thus, in yet another attempt to define the issues, one of Mr. Creager's first statements to the Nebraska Supreme Court during oral argument concerned the difficulty of responding by brief to the "subject of the remand," as requested by the briefing order, (filing 94, at 2; Evidentiary Hr'g Issue 34, Ex. 2), when he was unaware what the issues were. (Evidentiary Hr'g Issue 34, Vol. I, at 34:16–35:19.)

█ This evoked what Mr. Creager perceived to be a "shock[ing]" response. One of the judges said, "[Y]ou caused us to be here. You know what the issues are. This was your case, you got the Supreme Court to remand it to us." (*Id.* at 35:21–36:8.) [8]

---

**8.** At the evidentiary hearing on issue 34, Respondent's counsel made no objection to Mr. Creager's testimony describing his statements and those of various Nebraska Supreme Court judges during oral argument. Many of these statements were not offered for the truth of the matter asserted. However, all the statements are admissible for the truth of the matter asserted under Federal Rule of Evidence 803(24), the residual hearsay exception. Specifically, material statements made during oral argument as recounted by Mr. Creager are more probative than any other evidence Petitioner could procure through reasonable efforts. As noted in *Reeves IV*, 871

In an effort to clarify that the record before the court was the postconviction record and not the record for Reeves's direct appeal, Mr. Creager asked the court which record it was considering, prompting a second judge to ask, "[A]ren't you being disingenuous?" (*Id.* at 37:1–23.) After the judge noted that the court's rules permitted it to take notice of everything in its files related to a case, Mr. Creager asked, "[']Are you doing that? Are you telling me that in this case, you are taking notice of the trial record?['] And there was no answer." (*Id.* at 39:9–16.)

After that, Mr. Creager's argument focused on the reasons the Nebraska Supreme Court could not engage in resentencing. (*Id.* at 39:17–22.) Mr. Creager recalls commenting that "Mr. Reeves isn't here. Shouldn't he be here if you are going to sentence him[?]" (*Id.* at 37:7–8.) He also commented:

> [Resentencing] does not seem likely to work ... in any meaningful fashion on a case where the death sentence is' more than 10 years old, where the initial direct appeal was concluded more than seven years ago, where two members of this court did not hear the direct appeal, where different counsel is involved who had not participated in the original trial ... or direct appeal, and where ... what precisely constitutes the record on this appeal [is not clear].

(*Id* at 38:19–39:14; Ex. 101, at 3.)

In addition, Mr. Creager questioned resentencing Reeves when the court had not resolved the factual questions concerning whether Reeves had a prior substantial criminal history and whether the prior convictions appearing on Reeves's "rap sheet" were counseled. Although the court had ruled in Reeves's postconviction action that his lawyer's general objection to the presentence investigation report (PSR) did not constitute ineffective assistance of counsel, Mr. Creager

argued that the attorney acted unreasonably in not specifically objecting to the PSR as it related to uncounseled prior convictions.

> [The court] answered the issue before, as I recall, by saying there was the objection ..., and then said, by the way, the burden of proof was on Mr. Reeves to prove that he didn't have a prior substantial criminal history, which was exactly the opposite of the case law that was in effect at the time that he went up on appeal, so I ... posed the question, ... how can we resolve that question without some sort of a hearing on that because I didn't know whether the [PSR] was in the record or not at that time.

(*Id.* at 40:7–41:21.) Mr. Creager's goal in making these arguments was to "persuade the Court that we need to resolve these issues before we get to the question of sentencing." (*Id.* at 42:2–15.)

Despite Mr. Creager's arguments regarding the issue of resentencing,

> [w]hat I remember [about oral argument] is the lack of any inquiry from the Court, by question or comment or otherwise, that told me what they were doing or what they were thinking at that time. Not even a statement, ["]Mr. Creager, this is it. We have decided to resentence Mr. Reeves. You tell us what you think the sentence ought to be.["]

(*Id.* at 43:2–8.)

> To the best of my recollection, I don't believe that either I or Sharon Lindgren from the Attorney General's Office or any member of the Nebraska Supreme Court, individually or collectively, ever discussed by question, answer, argument, or otherwise, what an appropriate sentence for Randy Reeves would be, and what aggravating and mitigating circumstances were present in the case, so that you could

---

F.Supp. at 1190, and confirmed by counsel during the evidentiary hearing, (Evidentiary Hr'g Issue 34, Vol. I, at 38:4–16), no transcript or tape of the oral argument exists. The interests of justice clearly required the court to hear Mr. Creager's testimony. It would be odd jurisprudence indeed to review a death sentence without evidence of what actually took place during what (in retrospect) was actually the "sentencing hear-

ing." Finally, Respondent had sufficient advance notice that Mr. Creager would be called to recount the content of the oral argument, and Respondent was given an opportunity to rebut such testimony. (Filing 133 (noting in-chambers meeting with counsel and setting evidentiary hearing to consider the testimony of Reeves's lawyer regarding issue 34).)

argue the weight of whatever aggravating and mitigating circumstances there were. (*Id.* at 44:15–23.)

Mr. Creager first learned that this oral argument before the Nebraska Supreme Court was actually Reeves's sentencing hearing when he received the court's opinion and read it. (*Id.* at 43:9–11.) Had Mr. Creager known he was participating in a sentencing hearing and had the Nebraska Supreme Court permitted him to engage in the usual death-penalty sentencing procedure employed at the trial level, he would have (1) moved to continue oral argument; (2) asked the court to require the prosecutor to state which aggravating circumstances were thought to be present so he could narrow the focus of inquiry; (3) raised constitutional challenges or arguments regarding the application of aggravating circumstances to preserve the record for federal review; (4) consulted the trial and sentencing records and made appropriate objections; (5) further developed the issue of Reeves's prior criminal record and objected to the PSR; (6) offered additional mitigating evidence from Reeves and his institutional record; and (7) offered proportionality evidence. (*Id.* at 45:17–48:7; 82:5–7.)

Mr. Creager considered the possibility that the Nebraska Supreme Court could affirm Reeves's death sentence without further proceedings if the court took the position advanced by the state, discussed above, or if the court engaged in harmless-error analysis. (*Id.* at 85:2–25.) However, he "never thought for a minute that anybody would conclude that error in the aggravators and mitigators could be harmless error in [a] weighing state." (*Id.* at 86:1–4.)

> The possibility that I would have come out of this proceeding with a new sentencing[ ] never occurred to me ... it occurred to me only that it was conceivable under *Clemons* that they could, but under state law, I was convinced they couldn't.... [In my research,] I couldn't find anything that indicated that anybody had ever asked [the Nebraska Supreme Court] what authority do you have to resentence on remand from the federal system. We are not talking about direct appeals now. We are talking

about a remand from a collateral federal case, and all I could conclude was that this wasn't a direct appeal anymore. This was not a sentencing case. This was not the appeal of a sentencing case. This was an appeal of a post-conviction case which itself had all sorts of error in it. I couldn't find any logical way that the court could conclude that it could resentence.

(*Id.* at 86:7–87:3.)

The brief submitted by Mr. Creager in *Reeves III* is consistent with his testimony at the evidentiary hearing. It reflects a sincere frustration with the lack of notice. It also reflects a zealous but respectful attempt to make clear that the Nebraska Supreme Court would be committing egregious error of constitutional proportions if it decided to sentence Reeves without adequate notice and a meaningful opportunity to be heard.

In the introduction to his brief, Mr. Creager stated he was uncertain what the Nebraska Supreme Court intended to do and what issues it wanted discussed. He reminded the court that he had filed three motions in an effort to clarify the situation. He told the court that on "the chance that this Court will deny the aforegoing requests [for clarification], and proceed to a disposition without further notice to Reeves that he is to be resentenced, we will also briefly discuss capital sentencing issues ... so that such issues may be preserved for subsequent appeals, and federal habeas corpus proceedings." (Appellant's Br. Remand & Supp. Mots. at 10–11.)

Mr. Creager begged that he "not be called upon to speculate as to what issues are presented," and he pressed the court for advance notice of what it felt the issues were and for a delineation of the procedures the court would follow if it decided to resentence. (*Id.* at 10–11.) He further advised the court that if it decided to resentence, the "issues certainly cannot be adequately developed and responded to on the basis of the simultaneous exchanges of briefs, followed by a 20 minute argument 5 days later." (*Id.* at 11.)

Mr. Creager made it clear he was not prepared to argue sentencing issues without notice:

Reeves[ ] is doubtless entitled to the effective assistance of counsel in connection with this proceeding. We point out that present counsel for Mr. Reeves[ ] took no part in the initial trial, sentencing, or the direct appeal. Present counsel took no part in the trial of the post-conviction matter. Counsel was appointed, for the first time, on post-conviction appeal, after previous counsel had submitted Appellant's Brief.

How present counsel, on remand from the U.S. Supreme Court, can suddenly be called upon to address sentencing issues is difficult to comprehend. It would be fundamentally unfair and inconsistent with the concepts of effective assistance of counsel, and due process of law, to do so at this late stage of the proceeding, especially after so many years have lapsed, and without notice that such a proceeding is taking place. If proper notice is given, counsel can respond to his ethical duties to his client, or withdraw or file other motions for additional time if he is not prepared to respond.

(*Id.* at 23.)

Mr. Creager's brief presented six arguments:

(1) Appellate resentencing was unworkable and not within the jurisdiction of the Nebraska Supreme Court, *id.* at 11–17;

(2) The Nebraska Supreme Court lacked jurisdiction to resentence, *id.* at 17–18;

(3) Sentencing on appeal denied Reeves his rights to meaningful review by appeal, due process of law, and effective assistance of counsel, *id.* at 19–25;

(4) Certain peculiarities of Reeves's case made appellate sentencing speculative or impossible, *id.* at 26–34;

(5) Even if the court determined to resentence, certain constitutional issues (such as the fact that the presentence investigation report contained evidence improperly obtained from Reeves) precluded resentencing, *id.* at 35–44; and

(6) If the court determined to resentence, a sentence of death was not appropriate. *Id.* at 45–50.

Less than five pages of Mr. Creager's brief were devoted to whether Reeves should live or die if the court decided it could and would resentence.

ii. *Testimony of Sharon Lindgren*

At Respondent's request, a supplementary evidentiary hearing was held on March 18, 1996, to hear testimony from Sharon Lindgren, formerly an assistant attorney general for the Nebraska Department of Justice who appeared on behalf of the State of Nebraska in *Reeves II* and *Reeves III*. (Evidentiary Hr'g Issue 34, Vol. II, at 3:14–22; 5:16–25.)

Ms. Lindgren was admitted to the bar in Nebraska in 1976, to practice before the United States Supreme Court in 1980 or 1981, and to appear before the United States Court of Appeals for the Eighth Circuit one year later. (*Id.* at 3:8–13.) During her 12-year career with the Nebraska Department of Justice, Ms. Lindgren served as counsel of record before the Nebraska Supreme Court in approximately 47 criminal cases. (*Id.* at 4:9–17.) She handled her first capital case in 1979, ultimately handling between eight and ten such cases while at the Nebraska Department of Justice. (*Id.* at 4:23–5:4.)

Ms. Lindgren testified that the notice from the United States Supreme Court that certiorari had been granted, that judgment was vacated and the case remanded to the Nebraska Supreme Court for further consideration in light of *Clemons*, (*id.* at Ex. 1), together with the Nebraska Supreme Court's order setting oral argument and a briefing date, (*id.* at Ex. 2), and the *Clemons* decision itself provided her with adequate guidance regarding the issues then pending before the Nebraska Supreme Court on remand. (*Id.*, Vol. II, at 8:1–6.)

In her mind, the issue before the Nebraska Supreme Court was whether or not the affirmance of Reeves's sentences in his direct appeal complied with the requirements of *Clemons*. (*Id.* at 8:7–15; Ex. 102.) Ms. Lindgren agreed that she and Mr. Creager had spoken before oral argument, and she stated she understood Mr. Creager's argument would be that the Nebraska Supreme Court could not reweigh without having a hearing in the Supreme Court or remanding

to the district court, while her argument would be that the Nebraska Supreme Court could reweigh and then "either affirm or reverse" the sentence "without further input." (*Id.* at 9:18–10:9.)

In her brief, Ms. Lindgren argued that the Nebraska Supreme Court had already "reweighed" in *Reeves I* and could therefore simply affirm; that the Nebraska Supreme Court, in its automatic review of death-penalty cases, had always reweighed aggravating and mitigating circumstances whether or not the sentencing panel erred in its findings; and that this procedure complied with the requirements of *Clemons.* (*Id.* at 10:22–11:16; Ex. 102.)

Ms. Lindgren stated that in her civil and criminal experience before the Nebraska Supreme Court, she had never known the court to affirmatively frame issues for counsel in a proceeding before the court. (*Id.* at 10:10–18.)

Like Mr. Creager, Ms. Lindgren's brief was similar to her testimony at the evidentiary hearing. Her brief was very short, just eight pages. (*Id.* at Ex. 102.)

Ms. Lindgren argued that the sole issue "presented to the Court" was "[w]hether or not the affirmance of the defendant's sentences in his direct appeal [*Reeves I* ] complied with the requirements of *Clemons v. Mississippi.*" (*Id.,* Ex. 102, at 2 (book and page citation to *Clemons* omitted).) Ms. Lindgren concluded her brief by arguing that "the appellee respectfully requests that this court find that its affirmance of the appellant's sentences at the time of the direct appeal [*Reeves I* ] conformed with the requirements of *Clemons v. Mississippi,* and deny the appellant's request for relief." (*Id.* at 8 (book and page citation to *Clemons* omitted).)

### iii. *Affidavit of Chief Justice*

At the conclusion of the supplementary evidentiary hearing, Respondent attempted to offer as evidence the affidavit of the Chief Justice of the Nebraska Supreme Court, which bore the caption of this federal case.

The affidavit set forth the Chief Justice's opinion about how issues are framed in cases that have been remanded to the Nebraska Supreme Court by the United States Supreme Court. (*Id.,* Vol. II, at 12:16–19; Ex. 103.)

No prior notice of the affidavit's existence was given Petitioner's counsel, no prior notice was given that Respondent had contacted the Chief Justice (apparently privately) to obtain the affidavit, and no prior notice was given that the affidavit would be offered into evidence. (*Id.* at 12:25–15:2.) Upon objection by Reeves, the affidavit was not received in evidence because Respondent's counsel admitted it was hearsay and he knew of no exceptions that applied. (*Id.* at 15:3–16.) [9]

Accordingly, I gave the affidavit no consideration. Even if I had I considered it, however, the result in this case would be no different.

### iv. *Summary of Creager's and Lindgren's Perspectives Immediately Before Arguing Reeves III*

Neither lawyer expected the Nebraska Supreme Court to impose a new death sentence upon Reeves in *Reeves III.* Mr. Creager was uncertain what issues the Nebraska Supreme Court's order required him to brief and argue, but when he appeared for argument in *Reeves III,* he did not believe he was appearing at what amounted to a new, and final, sentencing proceeding. Ms. Lindgren likewise believed the matter involved only a 20–minute appellate argument about whether the direct appeal of *Reeves I* should be affirmed or reversed under *Clemons.*

### 3. *Before Reeves III, Nebraska Law Did Not Appear to Authorize Appellate Sentencing, and Reeves III Was "Cryptic" in Asserting Authority to Resentence.*

It is helpful to restate what I found previously in *Reeves IV* regarding the power of the Nebraska Supreme Court to engage in appellate sentencing under state law. It will then be helpful to restate what the court of appeals observed in *Reeves V* regarding the

---

9. The Federal Rules of Evidence generally apply to evidentiary hearings in habeas cases. Fed. R.Evid. 1101(e).

authority of the Nebraska Supreme Court to resentence.

In *Reeves IV*, I examined in great detail the Nebraska statutes, the opinion in *Reeves III*, and Nebraska Supreme Court opinions both before and after *Reeves III* to determine whether *Reeves III* could plausibly be interpreted to rest upon any known component of state law. *Reeves IV*, 871 F.Supp. at 1195–99. While I shall not restate the specifics in detail, I found that *Reeves III* cannot honestly be interpreted as resting upon any known component of Nebraska law. I came to this conclusion for three reasons.

First, I found that the Nebraska statutes did not appear to allow appellate resentencing because: (1) the statutes provide a specific procedure for sentencing before state district courts, but no such procedure is provided for appellate courts; (2) the statutes explicitly provide that the Nebraska Supreme Court's remedial powers in the event of harmful error are limited to reduction of sentence or ordering a new sentencing hearing; (3) the "weighing" function is explicitly given to the state district court sentencing panel, and the "review-and-analysis" function is allocated to the Nebraska Supreme Court; and (4) the only court authorized by statute to impose a death sentence is the state district court, not the Nebraska Supreme Court. *Reeves IV*, 871 F.Supp. at 1195–97.

Second, I carefully examined the Nebraska Supreme Court's opinion in *Reeves III* and found it silent on the question of whether the court had the power to impose the death penalty under state law. I specifically found that: (1) nowhere does the Nebraska Supreme Court explicitly confront the question of whether Nebraska law allows appellate resentencing; (2) nowhere does the Nebraska Supreme Court explain under what state grant of authority the court believed itself empowered to engage in appellate resentencing; and (3) nowhere does the Nebraska Supreme Court explain by reference to Nebraska's death-penalty laws how the court derived the power to sentence Reeves to death. *Reeves IV*, 871 F.Supp. at 1197–98.

Third, I examined the decisions of the Nebraska Supreme Court both before and after *Reeves III*. This examination established that Nebraska Supreme Court cases both before and after *Reeves III* failed to articulate any state-law basis for appellate sentencing. *Reeves IV*, 871 F.Supp. at 1198–99.

While disagreeing with me about whether the assertion of authority to sentence in *Reeves III* was founded upon state or federal law, the court of appeals majority (and the dissent) did agree that *Reeves III* was premised on a "cryptic assertion of authority to reweigh," *Reeves V*, 76 F.3d at 1429 n. 7, which brings me directly to Reeves's present due process claim.

If the Nebraska Supreme Court's reasoning concerning its authority to sentence appears "cryptic" to learned and fair-minded federal judges like those in the majority in *Reeves V*, and if a careful examination of Nebraska law reveals no apparent authority for appellate sentencing under state law, as found by *Reeves IV* (and not disturbed by *Reeves V*), one has no reason to doubt that the authority to resentence and the procedures related thereto were similarly unclear to Reeves and his lawyer when Reeves's appellate appointed counsel addressed the Nebraska Supreme Court. Reeves's point now is that the Nebraska Supreme Court did not inform him of the "cryptic" basis that would be used to take his life until it sentenced him to death. This argument is buttressed by both *Reeves IV* and *Reeves V*.

4. *The Nebraska Supreme Court Denied Reeves Due Process When It Sentenced Him to Death Because Reeves Had Neither Adequate Notice Nor a Meaningful Opportunity to be Heard and Was Prejudiced Thereby.*

Reeves lacked any realistic notice that as a result of his lawyer's brief (20 minutes) argument the Nebraska Supreme Court intended to change the law, apply the changed law to him, and sentence him to death at the same time. Moreover, because Reeves lacked adequate notice, he was not given a meaningful opportunity to plead for his life in his brief or argument. Reeves was prejudiced by the lack of notice and the lack of a meaningful opportunity to be heard. I reached these

related findings of fact and conclusions of law for the following reasons.

### a. *No Notice*

■ I find and conclude that Reeves was not provided with adequate notice that he would be sentenced to death simultaneously with the Nebraska Supreme Court's determination of whether it had the power to engage in appellate sentencing. I believe this to be the case for five reasons.

First, the Nebraska Supreme Court's written notice about what would be considered was extremely vague. The court set oral argument on the remand and directed the parties to file simultaneous briefs by December 31, 1990, "covering the subject of the remand." (Filing 94, at 2; Evidentiary Hr'g Issue 34, Ex. 2.)

At best, the notice informed Reeves only that the Nebraska Supreme Court would decide whether or not it had the power to "reweigh." Nothing about the notice suggested the court would actually engage in the reweighing (sentencing) process *at the same time* it determined whether or not it had the power to do so.

Second, the Nebraska appellate court refused without explanation to give Reeves adequate notice when he carefully and repeatedly asked the court for notice prior to oral argument. In three motions filed before oral argument, Reeves requested:

(1) that the court set a general order of procedure pursuant to Neb.Rev.Stat. § 29–2521 (Reissue 1989), which requires the court to set a general order of procedure at the outset of a sentence-determination proceeding relating to the death penalty, (Evidentiary Hr'g Issue 34, Ex. 4);

(2) that the Nebraska Supreme Court issue an order stating whether the court intended to engage in appellate resentencing, and if so, identifying the relevant sentencing issues, without which "Appellant and his counsel [ ] cannot adequately prepare for, brief, argue, or otherwise be heard with re-

spect to resentencing issues," (*id.,* Ex. 5); and

(3) that pursuant to Neb.Rev.Stat. § 29–2521, which allows presentation of evidence relevant to sentencing such as aggravating and mitigating circumstances, as well as argument for or against a death sentence, the Nebraska Supreme Court set an evidentiary hearing because "in the event [the Nebraska Supreme Court] undertakes to resentence Appellant, he should be given an opportunity to present additional evidence of mitigating circumstances together with briefs and arguments relating to the 'weight' of the various aggravating and mitigating circumstances found to exist". (*Id.,* Ex. 6.)

These motions appropriately called upon the Nebraska Supreme Court to give court-appointed appellate counsel meaningful direction so that he could adequately represent a client who faced the possibility of death. Yet, the Nebraska Supreme Court denied all three of Reeves's motions on February 1, 1991, without the slightest explanation. (Filing 94, at 30, 32.)

In particular, the summary denial of Reeves's request that "if the Court is to engage in resentencing on appeal," then "advanced notice thereof [be given], together with a statement of the issues that this Court deems relevant," (Evidentiary Hr'g Issue 34, Ex. 5), placed Reeves's counsel (and would have placed any other reasonable lawyer) in a real quandary.

There was no reason for Reeves or his counsel to assume the Nebraska Supreme Court would not be forthcoming about whether sentencing was likely or possible. As a result, the *summary* denial was inexplicable. As Mr. Creager put it, "I really had no clue as to what it meant." (Evidentiary Hr'g Issue 34, Vol. I, at 19:20–21.)

Third, it is undisputed [10] that two judges of the Nebraska Supreme Court orally refused to give Mr. Creager notice of the issues he faced despite his pointed requests at oral

---

10. Mr. Creager's description of his various ex-

changes with members of the court was not

argument.[11] The incidents referred to are described below.

In an attempt to define the issues, one of Mr. Creager's first statements to the Nebraska Supreme Court during oral argument concerned the difficulty of responding by brief to the "subject of the remand," as requested by the briefing order, (Filing 94, at 2; Evidentiary Hr'g Issue 34, Ex. 2), when he was unaware what the issues were. (Evidentiary Hr'g Issue 34, Vol. I, at 34:16–35:19.) Mr. Creager's typewritten outline of his oral argument confirms that he asked:

> I would also like to know if I am supposed to be arguing Mr. Reeves sentence, and if I am, how am I supposed to know that, when was I to prepare for it, and if so, why isn't Mr. Reeves hear [sic] to participate in this "critical sta[ge] of the proceeding" and make any statement as to his fate.

(Evidentiary Hr'g Issue 34, Ex. 101.)

Reeves's lawyer received a caustic response to his questions. In what Mr. Creager perceived to be a "shock[ing]" statement, one of the judges answered, "[Y]ou caused us to be here. You know what the issues are. This was your case, you got the Supreme Court to remand it to us." (Id., Vol. I, at 35:21–36:8.)

This was not the only difficulty Mr. Creager had endeavoring to clarify issues and procedures at oral argument. In an effort to point out that the record before the court was the postconviction record and not the record for Reeves's direct appeal, Mr. Creager asked the court which record it was considering. Mr. Creager's notes confirm that he asked:

> [W]e note that since this case is a postconviction proceeding, is the original trial transcript part of this record or not[?] I do not know if the presentence report that has been the subject of so much controversy is before this court or not. I note that this case is not captioned in the direct appeal case, so I do not know which pro-

ceeding will produce a final sentence, or order. I do not know whether each of the members of this court have read, in it's [sic] entirety, all of the trial record, and the record developed at the sentencing hearing, in preparation for this hearing.

(Evidentiary Hr'g Issue 34, Ex. 101.)

This prompted another unusual response from a member of the court. Apparently rhetorically, one of the judges asked, "[A]ren't you being disingenuous?" (Id., Vol. I, at 37:1–23.) After the judge noted that the rules permitted the court to take notice of everything in its files related to a case, Reeves's lawyer asked, "Are you doing that? Are you telling me that in this case, you are taking notice of the trial record? And there was no answer." (Id. at 39:9–16.)

Mr. Creager's question was not "disingenuous," as the per curiam opinion in Reeves III later made clear. In the one postconviction case decided since Clemons and before Reeves III, the Nebraska Supreme Court had considered only the conclusions of the sentencing panel, not the entire record. Reeves III, 239 Neb. at 424–27, 476 N.W.2d at 835–36 (discussing the second postconviction action in Otey, where the appellate court relied exclusively on the conclusions of the sentencing panel in the postconviction proceeding). Indeed, Reeves III explicitly stated that it would go beyond the sentencing panel's conclusions in Reeves's postconviction action and adopt a new rule that "[w]e henceforth require our review under Clemons to include an independent examination of the trial record, the presentence investigation, and the findings of the sentencing panel in order to determine the existence or nonexistence of aggravating and mitigating circumstances, as well as a reweighing of all the factors." Id. at 427, 476 N.W.2d at 836 (emphasis added).

Fourth, none of the judges of the Nebraska Supreme Court informed Mr. Creager at oral argument that they were considering whether to impose the death penalty as op-

---

disputed by Ms. Lindgren.

**11.** During the evidentiary hearing, Mr. Creager stated that he did not "mean to be disrespectful." (Evidentiary Hr'g Issue 34, Vol. I, at 21:12–13.)

On the contrary, Mr. Creager's conduct before this court and the Nebraska Supreme Court, while appropriately zealous, was exemplary and at all times respectful.

posed to deciding whether they had the power to sentence. Considering that the court sentenced Reeves to death after the oral argument, incredible as it may seem, not one question was asked regarding what the appropriate sentence should be:

What I remember [about oral argument] is the lack of any inquiry from the Court, by question or comment or otherwise, that told me what they were doing or what they were thinking at that time. Not even a statement, ["]Mr. Creager, this is it. We have decided to resentence Mr. Reeves. You tell us what you think the sentence ought to be.["]

(Evidentiary Hr'g Issue 34, Vol. I, at 43:2–8.)

To the best of my recollection, I don't believe that either I or Sharon Lindgren from the Attorney General's Office or any member of the Nebraska Supreme Court, individually or collectively, ever discussed by question, answer, argument, or otherwise, what an appropriate sentence for Randy Reeves would be, and what aggravating and mitigating circumstances were present in the case, so that you could argue the weight of whatever aggravating and mitigating circumstances there were.

(*Id.* at 44:15–23.)

Fifth, as set forth in detail in *Reeves IV,* Nebraska law gave Reeves no reason to believe the Nebraska Supreme Court could or would sentence him *at the same time the court decided whether it had the power to engage in appellate sentencing.* As previously pointed out, while the Nebraska Supreme Court now believes itself empowered to sentence, neither *Reeves III* nor any other opinion has stated where that power comes from under state law. Even more importantly in this context, whatever the state of Nebraska law *after Reeves III,* the law was unknowable at the time *Reeves III* was argued.

After all, the purpose of the remand by the United States Supreme Court was to allow the Nebraska Supreme Court to determine whether a Nebraska appellate court could sentence, and if so, under what circumstances. If the law on the power question was unclear to the United States Supreme Court, it was obviously unclear to Reeves (and everyone else).

It is unfair to suggest that Reeves could have or should have anticipated the answer to the appellate power question. It is even more unfair to suggest that Reeves could have or should have anticipated the answer to the appellate power question such that he was placed on notice that the court would simultaneously sentence him to death.

In sum, I find that Reeves was not given adequate notice because (1) the Nebraska Supreme Court's written notice about what would be considered was extremely vague; (2) the Nebraska Supreme Court refused without explanation to give Reeves adequate notice when he carefully and repeatedly asked the court for notice prior to oral argument; (3) two judges of the Nebraska Supreme Court orally refused to give Mr. Creager notice of the issues he faced despite his pointed requests at oral argument; (4) none of the judges of the Nebraska Supreme Court informed Mr. Creager at oral argument that they were considering whether to impose the death penalty as opposed to deciding whether they had the power to sentence; and (5) as set forth in detail in *Reeves IV,* Nebraska law gave Reeves no reason to believe the Nebraska Supreme Court could or would sentence him at the same time the court decided whether it had the power to engage in appellate sentencing.

#### b. *No Meaningful Opportunity to be Heard*

■ I find and conclude that lack of notice deprived Reeves of a meaningful opportunity to be heard. I arrived at this result for three reasons.

First, due to the lack of notice, Reeves's lawyer was not prepared to plead for his client's life; therefore, Reeves had no meaningful opportunity to be heard. However the 20–minute oral argument in *Reeves III* might otherwise be characterized, we know in retrospect that it was ultimately the one proceeding where it would be determined whether the *facts* developed at trial, in the presentence investigation, and before the sentencing panel warranted the death penalty.

Without some advance notice that the appellate argument was the equivalent of a sentencing proceeding where an advocate's knowledge of all the facts developed at trial and sentencing is critical, Reeves's lawyer could not be prepared to competently plead for his client's life. This is particularly true because Mr. Creager was not sufficiently familiar with the facts to competently argue what was an appropriate sentence. It must be remembered that Mr. Creager was appointed as appellate counsel in the state postconviction action. He was not involved in the trial or sentencing of Reeves. (Evidentiary Hr'g Issue 34, Vol. I, at 5:11–25; 12:1–16; 61:2–62:4.) In fact, Mr. Creager had never read the entire trial record. (*Id.* at 52:24–53:3.)

While he might be expected to be familiar with the legal and factual issues related to the postconviction action and related appeal, without advance notice it was unreasonable to expect Mr. Creager to be prepared to argue what the appropriate sentence should be. Mr. Creager repeatedly told the Nebraska Supreme Court that he was not prepared to argue the ultimate sentencing question without advance notice.

Mr. Creager's notes reflect that this lack of notice caused him to ask the court at oral argument "if I am supposed to be arguing Mr. Reeves sentence, . . . how I am supposed to know that [and] when was I to prepare for it . . . [?]" (Evidentiary Hr'g Issue 34, Ex. 101.) Moreover, in his brief, after emphasizing that he had filed motions requesting notice, Mr. Creager informed the Nebraska Supreme Court that he was not prepared to argue sentencing issues without notice:

> Reeves[ ] is doubtless entitled to the effective assistance of counsel in connection with this proceeding. We point out that present counsel for Mr. Reeves[ ] took no part in the initial trial, sentencing, or the direct appeal. Present counsel took no part in the trial of the post-conviction matter. Counsel was appointed, for the first time, on post-conviction appeal, after previous counsel had submitted Appellant's Brief.
>
> How present counsel, on remand from the U.S. Supreme Court, can suddenly be called upon to address sentencing issues is difficult to comprehend. It would be fundamentally unfair and inconsistent with the concepts of effective assistance of counsel, and due process of law, to do so at this late stage of the proceeding, especially after so many years have lapsed, and without notice that such a proceeding is taking place. If proper notice is given, counsel can respond to his ethical duties to his client, or withdraw or file other motions for additional time if he is not prepared to respond.

(Appellant's Br. Remand & Supp. Mots. at 23.)

Mr. Creager put the matter well when he answered a question from Respondent's counsel at the evidentiary hearing about whether the Nebraska Supreme Court "prevented" him from offering "any argument [he] desired on behalf of [his] client either in the form of briefing or oral argument." (Evidentiary Hr'g Issue 34, Vol. I, at 90:8–12.) Mr. Creager stated that as a practical matter the court had prevented him from competently addressing "why Randy Reeves should live":

> Well, I was prevented from arguing, as a practical matter, anything that had to do with the facts of the case because I wasn't familiar with it and didn't [try the case]. There wasn't anything on my radar screen that said you better go over, in light of what you have been told, and read the trial record and go in there and argue why Randy Reeves should live. Did the Supreme Court tell me I can't do that? No. . . . But did they give me time between December and February to do all that. I don't think—I don't think I had enough time to do all that.

(*Id.* at 90:13–22.)

Second, even if Mr. Creager had been familiar with the facts crucial to determining the appropriate sentence, the lack of notice made it impossible for him to prepare a cogent argument because no one knew what the standard of review or the record subject to review was until *after* briefing and argument. Consequently, Reeves had no meaningful opportunity to be heard.

As noted earlier, the purpose of the remand from the United States Supreme Court was to resolve the question of whether an appellate court had the power to sentence under state law, and if so, under what circumstances. Until that threshold power question was answered, Reeves's lawyer would have understood neither what standard of review would be used nor what the record consisted of upon which the review would be conducted. Without these two crucial pieces of information, Mr. Creager was hopelessly lost in fashioning an intelligible argument to save Reeves's life.

This problem is illustrated by the exchange between Mr. Creager and one of the Nebraska Supreme Court judges regarding whether the court would take judicial notice of the trial record. When Mr. Creager asked a question about the status of the record at oral argument, the judge suggested he was being disingenuous and refused to give him an answer. It was not until long after oral argument and submission of Reeves's brief that the Nebraska Supreme Court articulated its new rule and belatedly told Creager and Reeves what the standard of review was (de novo) and what the record subject to review contained (the trial record, the presentence investigation, and the findings of the sentencing panel). *Reeves III,* 239 Neb. at 427, 476 N.W.2d at 836.

Moreover, the "independent" standard of review meant that the *Reeves III* court could and would arrive at a new decision on *all* the aggravating circumstances and *all* the mitigating circumstances in light of *all* the evidence, just as if there had never been a prior sentencing decision. No lawyer could be prepared to plead for Reeves's life in a brief or at oral argument without knowing this entirely fresh decision-making process was going to take place. In common parlance, this was a "new ball game," one with a Kafkaesque twist. If Reeves lost, he died. Before Reeves's lawyer knew the contest had begun, it was over.

Third, there is no evidence that oral argument in *Reeves III* addressed the question of the appropriate sentence. It is thus apparent that the lack of notice failed to focus the attention of the court, and therefore counsel, on the question of whether the facts justified a death sentence. Hence Reeves was not given a meaningful opportunity to be heard since he was not actually heard at oral argument on the question of whether he should die.

As noted earlier, no transcript of the oral argument exists. We are left with the recollections of counsel. However, according to Mr. Creager, whom I believe, there was absolutely no discussion of the appropriate sentence at oral argument:

> To the best of my recollection, I don't believe that either I or Sharon Lindgren from the Attorney General's Office or any member of the Nebraska Supreme Court, individually or collectively, ever discussed by question, answer, argument, or otherwise, what an appropriate sentence for Randy Reeves would be, and what aggravating and mitigating circumstances were present in the case, so that you could argue the weight of whatever aggravating and mitigating circumstances there were.

(*Id.* at 44:15–23.)

Mr. Creager testified there was "[n]ot even a statement, [']Mr. Creager, this is it. We have decided to resentence Mr. Reeves. You tell us what you think the sentence ought to be.[']" (*Id.* at 43:2–8.) Ms. Lindgren did not contradict Mr. Creager in this regard. (Evidentiary Hr'g Issue 34, Vol. II.)

In sum, I find and conclude that the lack of notice deprived Reeves of a meaningful opportunity to be heard because (1) Reeves's appellate lawyer was not prepared to plead for his client's life as he was not familiar with the trial and sentencing record; (2) the lack of notice made it impossible to prepare a cogent argument since no one knew what the standard of review or the record subject to review was until *after* briefing and argument; and (3) the lack of notice resulted in no questions being asked or arguments presented during the 20–minute session regarding the issue of an appropriate sentence, and thus Reeves was not given an opportunity to be heard on this vital question.

### c. *Prejudice*

■ Based upon the foregoing, I find and conclude that Reeves was prejudiced by the

lack of notice and an opportunity to be heard. Based upon the foregoing, I further find and conclude that the constitutional error was not harmless beyond a reasonable doubt.

■ As the Supreme Court has reminded us, " '[D]eath is a different kind of punishment from any other which may be imposed in this country.' " *Lankford,* 500 U.S. at 125, 111 S.Ct. at 1732 (quoting *Gardner v. Florida,* 430 U.S. at 357, 97 S.Ct. at 1204). And " '[b]ecause of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Id.,* 500 U.S. at 125 n. 21, 111 S.Ct. at 1732 n. 21 (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (Stewart, Powell, & Stevens, JJ.)).

I am convinced "this is a case in which reasonable judges might differ concerning the appropriateness of the death sentence." *Lankford,* 500 U.S. at 124, 111 S.Ct. at 1731. In particular, after reviewing the entire record, I find and conclude that a reasonable judge (or a reasonable panel of judges) could easily conclude the death penalty was not warranted in this case:

> Reeves obviously did not appreciate the wrongfulness of his conduct in the same sense that many (and perhaps most) murderers do. Without question, he was entitled to the statutory mitigating factor set forth in Neb.Rev.Stat. § 29–2523(2)(g). The evidence indicates that Reeves is not, and has not been, a violent person by history or character. The evidence further reveals remorse on his part. The evidence also reveals a sort of drug-induced amnesia, although Reeves certainly took partial responsibility for the killings when he admitted stabbing and attempting to rape Mesner. . . . In this connection, I am especially cognizant of the fact that under Nebraska law the mitigating factors must only "approach" the weight given the aggravating circumstances in order for Reeves to avoid the death penalty; "[t]hey need not 'outweigh' the aggravating circumstances." *State v. Stewart,* 197 Neb. 497, 526, 250 N.W.2d 849, 866 (1977), *cert. denied sub nom. Abdullah v. Nebraska,*

510 U.S. 829, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993), *overruled in nonrelevant part on other grounds, State v. Palmer,* 224 Neb. 282, 314–15, 399 N.W.2d 706, 728–29 (1986).

*Reeves IV,* 871 F.Supp. at 1195 n. 16.

In this regard, the presentence report contains a large number of truly remarkable statements from interested and serious-minded individuals who knew both Reeves and victim Janet Mesner. Virtually all of these statements strongly suggest Reeves should not be put to death and offer important mitigating reasons in support of that view.

Even the sentencing panel, which ignored Reeves's clear entitlement to the statutory mitigating factor set forth in Neb.Rev.Stat. § 29–2523(2)(g), observed that *"[t]he court has received many letters from interested persons urging the court not to impose the death penalty in this case."* (Filing 71, at 325 (emphasis added).) In this regard, it is appropriate to remember that Reeves and Janet Mesner were related, and both were well known to members of the Quaker church they attended in their home community.

These statements establish strong nonstatutory mitigating factors upon which a reasonable judge might be moved to spare Reeves's life, depending, of course, upon the strength of appellate counsel's brief and oral argument. For example, Ms. Mesner's father told the probation officer that "he was a Quaker and opposed to capital punishment and further stated that he had recently testified at a legislative hearing in Nebraska regarding a bill to ban capital punishment." (PSR at 4.) Although Mrs. Mesner was ambivalent compared to her husband, (PSR at 4), *both* parents specifically wrote the trial judge to confirm in writing that neither parent sought the death penalty: "We want to tell you how we feel about the future of Randy Reeves. *We do not feel the need to avenge the death of our daughter, Janet, by taking Randy's life."* (PSR Attach., Letter of 4/6/81 (emphasis added).)

Another of Reeves and Mesner's relatives who knew them both well pleaded for leniency. He pointed out that Reeves had never

been violent in the past and that his death would only serve to compound the tragedy for the Reeves and Mesner families, who both attended the same Quaker church. This man's eloquent letter is summarized in pertinent part below:

> I am writing this letter not so much to plead for Randy Reeves as to plead for Janet Mesner's family, Randy Reeves' family and the church to which I belong. . . .
>
> I am related to both Janet and Randy and know them and their families quite well. We grew up together in the same church. . . . This, of course, means that Randy's family and Janet's family will see each other at church and our various family gatherings.
>
> Janet's death has been a difficult crisis for the two families but they are remarkable people and have been an inspiration to us all. . . . My cousin, Janet, was very strongly opposed to the death penalty, as are her parents and Randy's parents. Whether their attitudes toward capital punishment are correct is not important. What is important is that they do sincerely believe the death penalty is wrong and they know Janet sincerely believed it was wrong. . . .
>
> *I am sure you can understand that because of their opposition to the death penalty, Randy's death would be as unacceptable to both families as Janet's death. This is admittedly amplified by the fact that we did not see Randy as a violent or aggressive man. Our memories of him are irreconcilable with the events leading to Janet's death.*

(PSR Attach., Letter of 4/14/81 (emphasis added).)

When Mr. Creager was given neither adequate notice that the "judge[s] [were] contemplating the imposition of the death sentence" nor an opportunity to be heard, there was "created an impermissible risk that the adversary process may have malfunctioned in this case." *Lankford*, 500 U.S. at 127, 111 S.Ct. at 1733. While notice and the related opportunity to be heard are important in any criminal case, in the "capital context, in which the threatened loss is so severe, the need for notice is even more pronounced." *Id.* at 126 n. 22, 111 S.Ct. at 1732 n. 22.

An experienced and able advocate like Mr. Creager who knew in advance that he was briefing and arguing the question of whether or not Reeves should be sentenced to death, who was told beforehand what the standard of review and the record would be, and who was given a meaningful opportunity to be heard might well convince a reasonable judge (or a reasonable panel of judges) that Reeves should not be put to death. Consequently, the due process error that occurred in the Nebraska Supreme Court was prejudicial and of constitutional magnitude. I cannot state on this record that the error was harmless beyond a reasonable doubt.

### 5. *Respondent's Arguments Have No Merit.*

Respondent makes a number of arguments in an effort to save the death sentence. I am not persuaded by any of these arguments and shall mention only the few that merit a response.

■ First, I reject Respondent's argument that the order of the United States Supreme Court vacating the Nebraska judgment was the operative notice, and if the notice was defective, it was the fault of the Court. The United States Supreme Court did not give notice of what the Nebraska Supreme Court could or should consider under Nebraska law; rather, the Court vacated the *Reeves II* judgment and remanded the case so the Nebraska Supreme Court could make that determination pursuant to *Clemons*. It was entirely up to the Nebraska Supreme Court how it decided to handle the remand and what issues required discussion under *Clemons*. After all, this was (ostensibly) a matter of state law.

■ Second, I reject the argument that Mr. Creager had notice because he was familiar with *Reeves II* and had successfully convinced the United States Supreme Court to vacate *Reeves II* and remand the case. Respondent's argument confuses what Mr. Creager knew about the past with what he could be expected to know about the future.

The question is not whether Mr. Creager understood what he argued in *Reeves II* or in his petition for certiorari to the United States Supreme Court. Rather, the question is whether Creager and Reeves were fairly placed on notice about what the Nebraska Supreme Court would do in the future in answer to the unresolved question which triggered the vacation of *Reeves II*.

As I observed before, the purpose of the remand by the United States Supreme Court was to allow the Nebraska Supreme Court to determine whether a Nebraska appellate court could sentence under Nebraska law, and if so, under what circumstances. This was entirely an open question. Indeed, if the law on this fundamental question of power was unclear to the United States Supreme Court, it was obviously unclear to Mr. Creager.

Moreover, Mr. Creager's success in getting the judgment in *Reeves II* vacated does not by any stretch of the imagination prove that he could have or should have anticipated the answer to the appellate power question. It is even more ludicrous to suggest that Mr. Creager could have or should have anticipated the answer to the appellate power question such that he was placed on notice that the court would simultaneously sentence Reeves to death and should therefore have been prepared to address this sentencing issue in the 20 minutes allotted him.

Specifically, Mr. Creager did not even know what the standard of review or the record was until *after* he briefed and argued *Reeves III*. There was nothing about his experience in *Reeves II* or before the United States Supreme Court to warn him what the Nebraska Supreme Court was going to do in *Reeves III*. Even Ms. Lindgren, counsel for Respondent, did not anticipate resentencing because she believed the matter involved only an argument about whether the direct appeal of *Reeves I* should be "affirmed or reversed" under *Clemons*.

■ Third, I also reject the argument that Reeves had some obligation to frame the issues. Initially, I note that the Nebraska Supreme Court never asked Reeves to frame the issues; rather, it framed the issues without any input from counsel. Moreover, the court used an unusual simultaneous briefing process that gave the lawyers no chance to formally reply to one another, thus prohibiting them from framing the issues in their briefs. Indeed, one need only read the two briefs to understand that the lawyers argued about entirely different things. Still further, when Reeves tried to clarify the issues by filing three motions explicitly asking the court for direction, he received in response a curt denial with no explanation.

With sincere respect for its conscientious judges, the responsibility for the lack of notice falls squarely and solely upon the Nebraska Supreme Court, not upon Reeves. As the United States Supreme Court forcefully said, "[O]ur cases have repeatedly emphasized the importance of *giving the parties* sufficient notice to enable them to identify the issues on which a decision may turn." *Lankford*, 500 U.S. at 126 n. 22, 111 S.Ct. at 1732 n. 22 (emphasis added).

■ Fourth, I am not persuaded by Respondent's argument that the Nebraska Supreme Court has always engaged in "appellate reweighing"; therefore, imposing the death penalty in *Reeves III* was really no different from what the court had done in other cases. Thus, this specious argument continues, Reeves was on notice that the Nebraska Supreme Court might sentence him to death.

The premise of Respondent's assertion is fundamentally irrelevant. Even if the Nebraska Supreme Court had "always" engaged in "reweighing," the remand from the United States Supreme Court called upon the Nebraska appellate court to decide the question of *whether it had the power to reweigh (re-sentence)*. Prior to *Reeves III*, the Nebraska Supreme Court had never explicitly confronted the power question, and that is, of course, why the Supreme Court vacated *Reeves II* and remanded the case.

As a consequence, Reeves and his counsel could not have anticipated the Nebraska Supreme Court's answer to the power question. More importantly, however, the fact that the Nebraska Supreme Court was going to determine whether it had the power to sentence certainly did not place Reeves

on notice that the court would simultaneously decide that he should die.

Moreover, whether or not the Nebraska Supreme Court had previously engaged in "reweighing" does not change the fact that *Reeves III explicitly announced a new "reweighing" rule.* The Nebraska Supreme Court was clear that the new rule—complete de novo review—was a resolution of conflicting procedures (review of record with reliance upon the conclusions of a sentencing panel versus review of sentencing-panel conclusions alone) that had been used in the past:

> *We henceforth* require our review under *Clemons* to include an *independent examination* of the trial record, the presentence investigation, and the findings of the sentencing panel in order to determine the existence or nonexistence of aggravating and mitigating circumstances, as well as a reweighing of all the factors.

*Reeves III,* 239 Neb. at 427, 476 N.W.2d at 836 (emphasis added). It is absurd to suggest that Reeves should have somehow anticipated that the Nebraska Supreme Court would adopt a new rule and at the same time apply it to him.

Furthermore, the two cases Respondent cites in his reply brief regarding the alleged past practice of reweighing do not even superficially support the argument that such decisions placed Reeves on notice of what the Nebraska Supreme Court would do in *Reeves III.* Respondent cites *State v. Stewart,* 197 Neb. 497, 250 N.W.2d 849 (1977), and *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881 (1977).

In *Stewart,* the Nebraska Supreme Court reduced a death sentence to life in prison. As I observed in *Reeves IV,* Nebraska statutes give the appellate court the power to *reduce* a death sentence, but they *do not* empower an appellate court to *impose* a death sentence. *Reeves IV,* 871 F.Supp. at 1196 (discussing Neb.Rev.Stat. § 29–2521.03 (Reissue 1989).) *Stewart* would therefore have been meaningless to counsel.

The *Simants* case would have been even less revealing to Reeves's lawyer. First, the death penalty affirmed in *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881 (1977), was later vacated in *Simants v. State,* 202 Neb. 828, 277 N.W.2d 217 (1979). Simants was tried again, found insane, and committed to a mental institution. *State v. Simants,* 248 Neb. 581, 537 N.W.2d 346 (1995). Second, *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881 (1977), was overruled in part by *Reeves II* [12] with regard to a burden-of-proof issue on mitigating factors. *Reeves II,* 234 Neb. at 738, 453 N.W.2d at 377 (overruling *Simants* and refusing to assign burden of proof with regard to mitigating factors). Third, nowhere in *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881 (1977), does the Nebraska Supreme Court come close to articulating the new "independent" determination rule set forth in *Reeves III.* Compare *Reeves III,* 239 Neb. at 427, 476 N.W.2d at 836 *with Simants,* 197 Neb. at 569, 250 N.W.2d at 892–93.

In sum, neither *Stewart* nor *Simants* (nor any other Nebraska cases) would have given Reeves's lawyer a basis to predict what was coming in *Reeves III.* As a matter of fact, at about the time *Reeves III* was being argued to the Nebraska Supreme Court, the United States Court of Appeals for the Eighth Circuit believed it was appropriate to remand Nebraska death-penalty cases to the sentencing panel when harmful error occurred in the sentencing process. *Holtan v. Black,* 838 F.2d 984, 985–86 & n. 4 (8th Cir.1988). *See also State v. Holtan,* Doc. 092, No. 634 (Dist. Ct. Douglas County, Neb., Oct. 17, 1989 (order of resentence upon remand) (imposing life sentence)).

The *Holtan* court came to believe this was the appropriate practice because of an explicit concession made by the attorney general of the State of Nebraska. As the court stated, "[T]he *State of Nebraska concede[d]* that a remand is necessary to ... *the state trial court* " in order to determine "whether the State has carried its burden of proof to show aggravating circumstances to exist beyond a

---

**12.** Since Mr. Creager appeared as counsel of record in *Reeves II,* he would have been aware of this ruling.

reasonable doubt thereby justifying the death penalty." *Holtan,* 838 F.2d at 985 (emphasis added).

If the Nebraska attorney general was conceding in federal court that remand to a sentencing panel was required in a death-penalty case when there was harmful error by the sentencing panel, Reeves certainly could not be expected to anticipate what was going to happen in *Reeves III* with regard to the threshold power question of whether a state appellate court could, consistent with state law, "fill the gap." More to the point, Reeves certainly was not on notice that the appellate court would decide the threshold question and sentence him to death at the same time.

### B. Issue 26—Consideration of Uncounseled Statements [13]

■■■■ This claim asserts that the presentence report contained uncounseled statements Reeves gave to a probation officer. In his brief Reeves ties these statements to his criminal history. Reeves asserts that since the Nebraska Supreme Court failed to grant him the "no-significant-prior-criminal-activity" statutory mitigation factor, *compare* Neb. Rev.Stat. § 29–2523(2)(a) (Reissue 1989) *with Reeves III,* 239 Neb. at 433, 476 N.W.2d at 839–40, his uncounseled statements about his criminal history were improperly used under *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (statements made by defendant to a psychiatrist in the pretrial stages of a criminal case could not later be used against him for purposes of the death penalty when the statements were made without warning and without benefit of counsel).[14]

Respondent does not contest the factual assertion that the probation officer took un-counseled statements from Reeves relative to his criminal history.[15] However, Respondent does argue that the Nebraska Supreme Court clearly did not consider those uncounseled statements in *Reeves III,* and thus there was no error. I agree with Respondent for two related reasons.

First, this same issue was raised in *Reeves II.* In *Reeves II,* the Nebraska Supreme Court made clear that the sentencing panel was fully aware of *Estelle* and had stated it would only consider admissible evidence. *Reeves II,* 234 Neb. at 758–59, 453 N.W.2d at 387–88. Thus, in *Reeves II,* the Nebraska Supreme Court held that no error had occurred because the sentencing panel knew it could not consider uncounseled statements in the PSR. *Id.* There is no reason to believe the *Reeves III* court forgot what it clearly understood to be the law in *Reeves II* when the court sentenced Reeves to death in *Reeves III.*

Second, the *Reeves III* court made clear that it denied Reeves the mitigating factor for lack of criminal activity after reviewing the PSR which contained, to use the court's words, a " 'rap sheet.' " *Reeves III,* 239 Neb. at 433, 476 N.W.2d at 839 (After noting it had reviewed the presentence report and the "rap sheet" contained therein, the court stated, "[W]e find that Reeves has a history of criminal offenses, including arrests and convictions for marijuana possession, insufficient-fund checks, and disturbing the peace.").[16] There is no indication in the opinion that the court gave any significance to any statements made by Reeves regarding his record as opposed to considering the "rap sheet."

Indeed, the court recognized that Reeves's record was "petty and nonviolent." *Reeves*

---

**13.** Respondent makes no claim of lack of exhaustion or procedural default regarding this issue.

**14.** Based upon the brief he submitted to me on remand, Reeves limits his argument regarding this claim to the assertion that the uncounseled statements were used to deny him the no-significant-prior-criminal-activity mitigating factor. He makes no claim that the statements were improperly used for some other purpose. In any event, I find that the statements were not improperly used for some other purpose.

**15.** I have reviewed the report. It does contain statements by Reeves about his criminal history that were apparently obtained without counsel. (PSR at 9 (incident of 8/31/74); PSR at 10 (incident of 3/14/75); PSR at 12 (incident of 11/22/78); PSR at 13 (incident of 11/28/78).)

**16.** The PSR does contain such a "rap sheet," which is the probation officer's summary of what various criminal history records revealed. (PSR at 9–14.)

*III,* 239 Neb. at 433, 476 N.W.2d at 839–40. However, the court also stated Reeves was not entitled to the mitigating factor because the "language of the statute does not require past criminal acts to be violent or even that convictions result to prevent a finding" of entitlement to the mitigating factor. *Id.,* 239 Neb. at 433, 476 N.W.2d at 840. Thus, it was the language of the statute and a petty criminal history, not Reeves's statements about that history, which persuaded the *Reeves III* court to conclude that he was not entitled to the mitigating factor.

That Reeves had a petty criminal history has never been disputed, although Reeves has argued it was not as extensive as reflected by the PSR. For example, Mr. Cohen, the postconviction lawyer appointed to represent Reeves prior to Mr. Creager, independently investigated Reeves's criminal record. (*Reeves II* Appellant's Br. at 10 (discussing postconviction counsel's investigation of the facts of the criminal activity set forth in the PSR, including his examination of certified copies of court proceedings and review of his law clerk's report of her personal investigation of court files).) Mr. Cohen told the Nebraska Supreme Court that "Appellant's record of conviction include ... three misdemeanor convictions for possession of marijuana, three insufficient fund checks, ... one disturbing the peace and one incident of stealing goods less than $300." (*Id.*) The lawyer's admission was nearly identical to the finding made by the *Reeves III* court. *Reeves III,* 239 Neb. at 433, 476 N.W.2d at 839 ("[W]e find that Reeves has a history of criminal offenses, including arrests and convictions for marijuana possession, insufficient-fund checks, and disturbing the peace.").

In summary, claim 26 should be denied on the merits because the *Reeves III* court was fully aware of *Estelle v. Smith,* and it is clear that Reeves's uncounseled statements to the probation officer about his criminal history did not cause him to be denied the sought-after mitigating factor.

## C. Issue 27—Consideration of Unreliable Information

Reeves asserts in claim 27 that the presentence investigation report contained unreliable and inaccurate information, was racially biased, and included hearsay and speculative statements. I am not persuaded by Reeves's argument.

 First, Respondent argues that claim 27 is subject to procedural default. I disagree. This claim (and related claims) was specifically considered and denied on the merits in *Reeves II,* 234 Neb. at 758–59, 453 N.W.2d at 388. Moreover, Reeves reasserted all claims previously asserted when he filed his timely motion for rehearing in *Reeves III.* (Filing 71, particularly second doc. blue binder at 4, ¶ 11 (Mot.Reh'g attached to Mot.Stay).)

The motion for rehearing was filed seven days after *Reeves III* was issued. Respondent has conceded that the proper mechanism for obtaining review of an opinion of the Nebraska Supreme Court is to file a motion for rehearing pursuant to Rule 13 of the court's rules, and Respondent has also conceded that the time for filing a motion for rehearing under Rule 13 is ten days. (Br.Resp.Order of 6/15/94, at 2, 5–6.) The Nebraska Supreme Court denied the motion without comment, and issued its mandate. (Filing 94, at 32.)

Accordingly, Reeves gave the Nebraska Supreme Court a full and fair opportunity to consider claim 27 (and related claims) in *Reeves III.* There was no procedural default on this claim. *See also Reeves IV,* 871 F.Supp. at 1222–23 & n. 12 ("Whether a claim is raised in the remand brief or the rehearing brief, the Nebraska Supreme Court would be placed on notice of the legal and factual bases of the claim; fair presentment requires no more.")

 Second, although claim 27 was not procedurally defaulted, it has no merit on this record.[17] I agree with the court in *Reeves II.* *Reeves II,* 234 Neb. at 758–59, 453 N.W.2d at 388. Moreover, I find and conclude that: (1) although Reeves's trial

---

17. Reeves did not request an opportunity to present evidence concerning this claim. *See Reeves*

*IV,* 871 F.Supp. at 1240 (discussing requests for evidentiary hearing).

counsel objected generally to admission of the PSR into evidence at the sentencing hearing, counsel never claimed it contained specific inaccuracies; (2) Reeves has failed to assert any plausible claim of prejudice resulting from the alleged inaccuracies, and a careful examination of the PSR and *Reeves III* reveals no evidence that the alleged inaccuracies harmed Reeves in any way; and (3) the bald assertion that the PSR was racially biased is insufficient, and after carefully reading both the PSR and *Reeves III*, I cannot find any suggestion of racial prejudice.

■ In his reply brief on remand in this case, Reeves argues that the PSR was specifically inaccurate because it recited the probation officer's impressions about whether Mr. and Mrs. Mesner (parents of victim Janet Mesner) had quarreled over the appropriateness of the death penalty. (PSR at 4.) As noted earlier, Mr. Mesner had taken a strong public stand against the death penalty by testifying before the Nebraska legislature.

In particular, Reeves objects to the suggestion in the PSR that after an interview the probation officer believed "Mrs. Mesner seemed quite concerned that the defendant might be set free at some later date should he be given a life sentence by the Court." (PSR at 4.) The difficulty with Reeves's assertion is that the probation officer also included in the PSR a complete copy of a letter from *both* Mr. and Mrs. Mesner stating, "We want to tell you how we feel about the future of Randy Reeves. *We do not feel the need to avenge the death of our daughter, Janet, by taking Randy's life.*" (PSR Attach., Letter of 4/6/81 (emphasis added).) As a consequence, the PSR appears to have been a balanced presentation of the views of both Mr. and Mrs. Mesner, views largely in favor of sparing Reeves the death penalty.

### D. Issue 36—Consideration of "Unadjudicated Misconduct"

■ Reeves asserts in claim 36 that on remand the Nebraska Supreme Court improperly considered evidence of "inaccurate and unreliable allegations of unadjudicated misconduct." This is essentially a variant of claims 26 and 27, with a slightly different assertion of prejudice. On the merits, I am not persuaded by Reeves's argument.

First, Respondent argues that this issue was procedurally defaulted, but I disagree for the reasons discussed earlier. The Nebraska Supreme Court had a full and fair opportunity to consider the issue on the merits in *Reeves II*, and it was reasserted in the motion for rehearing in *Reeves III*.

Second, for the reasons articulated above regarding the merits of claims 26 and 27, I am similarly unpersuaded by Reeves's argument concerning claim 36. I pause only to address Reeves's slightly different claim of prejudice with regard to claim 36.

Reeves asserts that the PSR contains statements by various people that he may have been violent in the past. In his reply brief on remand, Reeves gives as an example the statement by Mr. and Mrs. Mesner that "they had heard stories of Randolph Reeves being violent at times but that they had no direct knowledge of this fact." The PSR does indeed make this statement. (PSR at 4.)

The difficulty with this argument is that the *Reeves III* court found as a matter of fact that: (1) Reeves had only a record of petty criminal offenses; (2) Reeves's criminal record did not reveal that he had been violent; and (3) the evidence and the PSR revealed that Reeves was a passive person and "the commission of any violent act would be totally out of character for Reeves." *Reeves III*, 239 Neb. at 433, 436–37, 476 N.W.2d at 841. Thus, there is no reason to believe the *Reeves III* court considered "inaccurate and unreliable allegations of unadjudicated misconduct," assuming such allegations crept into the PSR.

### E. Issue 5—"Especially Heinous" and Sexual Assault

■ Claim 5 argues that aggravating factor "(1)(d)" of Neb.Rev.Stat. § 29–2523(1)(d) (Reissue 1989), relating to the phrase "especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence," is unconstitutionally vague. As the *Reeves III* court applied this aggravating factor to Petitioner with regard to the attempted sexu-

al assault, I disagree with Reeves on the merits.

In his brief on remand, Reeves changes the position he previously asserted in this court. Reeves now acknowledges that this prong of section 29–2523(1)(d) received a limiting construction by the Nebraska Supreme Court that has been found constitutionally sufficient by the court of appeals. *Williams v. Clarke,* 40 F.3d 1529, 1536–38 (8th Cir. 1994) (holding, among other things, that sexual abuse during the commission of a murder is a constitutionally permissible objective identifier of the existence of "especially heinous" conduct, and that the Nebraska Supreme Court had so narrowed the statute), *cert. denied,* —— U.S. ——, 115 S.Ct. 1397, 131 L.Ed.2d 247 (1995). Reeves now argues that the *Reeves III* court expanded this "sexual abuse" narrowing construction when it sentenced him to die.

First, Respondent argues that this claim is subject to procedural default. I disagree. I believe the claim was sufficiently asserted in the motion for rehearing in *Reeves III* so as to be fairly presented, (Filing 71, particularly second doc. blue binder at 3–4, ¶ 10 (Mot. Reh'g attached to Mot.Stay)), and the court addressed this issue when it denied the motion for rehearing.

Second, in *Reeves III,* the Nebraska court found that since Reeves had tried to rape Janet Mesner, the "especially heinous" part of section 29–2523(1)(d) applied. *Reeves III,* 239 Neb. at 431–33, 476 N.W.2d at 838–39. The court also noted that the murder and attempted rape of Ms. Mesner "was particularly unsettling" because of Reeves's prior relationship with the victim. *Id.,* 239 Neb. at 432–33, 476 N.W.2d at 839. Reeves claims that when the court made this statement, it unconstitutionally expanded the narrowing construction previously given to the first prong of section 29–2523(1)(d). I disagree.

Simply put, the *Reeves III* court said nothing more or less than that Reeves's murder of Janet Mesner while attempting to rape her qualified him for the first prong of section 29–2523(1)(d) beyond a reasonable doubt, and when the sentencing judges "weighed" this factor and others, Reeves's warm relationship with Ms. Mesner was sig-

nificant. In other words, the *Reeves III* court did not apply the sexual assault limited aggravator because Reeves had a warm relationship with Ms. Mesner. Rather, the court applied the aggravator because Reeves tried to rape Ms. Mesner, and this sexual assault on a friend particularly repulsed the judges as they weighed whether Reeves should die for her murder. I find and conclude that *Reeves III* did not expand the narrowing construction of section 29–2523(1)(d) regarding sexual assault as that section was applied to Reeves.

### F. Issue 38—"Especially Heinous" and Infliction of Pain

■ Reeves asserts in claim 38 that on remand the Nebraska Supreme Court used the incorrect standard when it applied the first prong of aggravating factor "(1)(d)" regarding Ms. Mesner's death and Reeves's infliction of unnecessary pain upon her. This argument is a variant of claim 5, and it focuses upon the application of the narrowing construction of the first prong of that section insofar as "pitiless crime" is concerned. I disagree that the *Reeves III* court applied the wrong standard.

Like the "sexual abuse" narrowing construction, the Nebraska Supreme Court has also narrowed the first prong of section 29–2523(1)(d) by stating that the first prong may be applied in circumstances where the murders involve "pitiless crime" as well as sexual assault. *Reeves III,* 239 Neb. at 431–33, 476 N.W.2d at 838–39. "Pitiless crime" specifically refers to conduct "unnecessarily torturous to the victim." *Id.,* 239 Neb. at 431, 476 N.W.2d at 838. Reeves does not challenge this narrowing construction. *See Harper v. Grammer,* 895 F.2d 473, 478–79 (8th Cir. 1990) (finding that narrowing construction of section 29–2523(1)(d) to a murder that is "unnecessarily torturous to the victim satisfies the constitutional requirements").

Instead Reeves argues that since he was entitled to the mitigating factor relating to his use of alcohol and drugs, according to *Reeves III,* he "was in no condition to form a design to deliberately inflict physical suffering upon Ms. Mesner." (Pet'r's Reply Br. Remand at 10.) Thus, so the argument goes,

the *Reeves III* court expanded the narrowing construction relating to "pitiless crime" because the court applied this narrowing construction on the implicit assumption that one could engage in such conduct without the cognitive ability to recognize that one is inflicting pain.

First, Respondent once again argues that this claim is subject to procedural default. Once again, I disagree. I believe the claim was sufficiently asserted in the motion for rehearing in *Reeves III* so as to be fairly presented, (filing 71, particularly second doc. blue binder at 3, ¶ 10 (Mot.Reh'g attached to Mot.Stay)), and the court addressed this issue when it denied the motion for rehearing.

Second, I do not believe the *Reeves III* court expanded its previous narrowing construction regarding "pitiless crime" by finding that one could engage in such conduct without the cognitive ability to recognize that one is inflicting pain. On the contrary, the Nebraska Supreme Court found beyond a reasonable doubt that the evidence was sufficient to conclude the crime was "pitiless," *Reeves III*, 239 Neb. at 432, 476 N.W.2d at 839, and "pitiless" was understood by the court to mean "unnecessarily torturous to the victim." *Id.*, 239 Neb. at 431, 476 N.W.2d at 838.

The court delineated the reasons for this finding and conclusion: (1) Reeves remembered and admitted raping and stabbing Mesner; (2) Reeves stabbed Mesner in the chest seven times prior to, during, or after the attempted sexual assault; (3) the evidence, including blood covering the floor, established that a violent struggle had taken place; (4) the phone had been ripped from the wall and because of this the victim, in great pain, was forced to go downstairs to call for help; (5) the victim, who had been on friendly terms with Reeves, suffered tremendous pain for a number of hours before she died; and (6) Reeves's "impairment by drug and alcohol use did not diminish his capacity to intentionally locate and break into Mesner's house, sexually assault or attempt to sexually assault her, [and] stab her...." *Reeves III*, 239 Neb. at 431–33, 436–37, 476 N.W.2d at 838–39, 841.

I have independently examined the record. I find and conclude there is credible and reliable evidence to support each of these factual findings by the *Reeves III* court.

■ Whether I would agree with the Nebraska Supreme Court if I were a judge entrusted with the sentencing decision on this issue is not the relevant question. While I might not come to the same conclusion as did the Nebraska Supreme Court, the only pertinent federal question is whether the Nebraska Supreme Court improperly expanded its narrowing construction of the first prong of section 29–2523(1)(d) by applying the aggravator to a fact pattern which did not fairly implicate the aggravator. *Lewis v. Jeffers*, 497 U.S. 764, 783, 110 S.Ct. 3092, 3103, 111 L.Ed.2d 606 (1990) ("A state court's finding of an aggravating circumstance in a particular case—including a *de novo* finding by an appellate court that a particular offense is 'especially heinous ... or depraved'—is arbitrary or capricious if and only if no reasonable sentencer could have so concluded.").

■ Such is not the case here. After viewing the evidence in the light most favorable to the prosecution, as I must according to *Lewis v. Jeffers*, 497 U.S. at 781, 110 S.Ct. at 3102–03, the evidence is sufficient to allow a reasonable sentencing judge to conclude beyond a reasonable doubt that the murder of Janet Mesner was "unnecessarily torturous to the victim" because Reeves had the cognitive capacity to know that he was inflicting great and unnecessary pain on Ms. Mesner by stabbing her not once, but seven times either before, after, or during the attempted sexual assault. *Reeves III*, 239 Neb. at 431–33, 476 N.W.2d at 838–39. Accordingly, the *Reeves III* court did not expand its previous narrowing construction of section 29–2523(1)(d) by using the wrong standard.

### G. Issue 6—"Apparent Effort" to Conceal Crime/Identity

■ Reeves argues in claim 6 that aggravating factor "(1)(b)," found in Neb.Rev.Stat. § 29–2523(1)(b) (Reissue 1989), pertaining to an "apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator" is unconstitutionally vague

because of the use of the word "apparent." He also seems to suggest the statute was improperly applied to him even if the language of the statute was limited. I do not agree that Reeves is entitled to relief.

In *Reeves III*, the Nebraska Supreme Court found that aggravator "(1)(b)" applied to Reeves regarding his slaying of Victoria Lamm. The court stated:

[W]e do find circumstance (1)(b) to exist as to the murder of Lamm. Apparently Lamm, who was sleeping in another room in the house, heard Reeves attack Mesner and went to Mesner's room to investigate. She evidently surprised Reeves during his assault upon Mesner, causing him to stab her to death. Reeves admitted that he did not know Lamm and did not know she was in the house when he went there. He cannot remember killing her. We can offer no explanation for the murder of Lamm other than that Reeves wanted to prevent Lamm from identifying him. If he was intent on continuing with his assault of Mesner despite Lamm's presence, he could have tied Lamm up or knocked her unconscious. Reeves was 6 feet tall and weighed approximately 200 pounds. Lamm was 5 feet 8 inches tall and weighed approximately 125 pounds. Clearly he could have overpowered her. Lamm posed no threat to Reeves except as a witness to his assault upon Mesner. We find circumstance (1)(b) to exist beyond a reasonable doubt.

*Id.*, 239 Neb. at 435, 476 N.W.2d at 840–41.

I have independently examined the record. I find and conclude there is credible and reliable evidence to support each of these factual findings by the *Reeves III* court.

First, Respondent argues that this claim is procedurally defaulted. I disagree. This claim (both as to the face of the statute and as applied to *Reeves*) was specifically considered and denied on the merits in *Reeves I*, 216 Neb. at 225–26, 344 N.W.2d at 446, and *Reeves II*, 234 Neb. at 754, 453 N.W.2d at 385–86. Moreover, Reeves reasserted all claims previously asserted when he filed his timely motion for rehearing in *Reeves III*. (Filing 71, particularly second doc. blue binder at 4, ¶ 11 (Mot.Reh'g attached to Mot. Stay).) Accordingly, for the reasons expressed earlier, this claim is not subject to procedural default.

■ Second, the vagueness claim must fail since the Nebraska Supreme Court has adopted this court's limiting construction of the word "apparent" with regard to this aggravating factor. *Reeves II*, 234 Neb. at 754, 453 N.W.2d at 386 ("We agree with the court's analysis of this circumstance in *Holtan v. Black*, No. CV84–L–393, slip op. at 20, 1986 WL 12479 (D.Neb. Nov. 5, 1986), that 'apparent' means 'readily perceptible,' and therefore 'the provision cannot be applied in speculative situations or where a strained construction is necessary to fulfill it.'"). *See Holtan v. Black*, No. CV84–L–393, 1986 WL 12479 *14–15 (D.Neb. Nov. 5, 1986) (Urbom, J.), *aff'd in part and rev'd in part on other grounds*, 838 F.2d 984 (8th Cir.1988).

I agree with the *Reeves III* court that Judge Urbom's limiting construction of the statute saves it from being unconstitutionally vague. Moreover, the *Reeves III* court obviously did not forget what it said about this issue in the *Reeves II* decision, and it is thus equally obvious that the *Reeves III* court applied the aggravating factor with the limiting construction in mind.

Reeves's real argument may be that the evidence will not rationally support application of this aggravator even if the statute is limited. Reeves seems to argue that the evidence simply does not support the claim that he killed Lamm to conceal a crime or to conceal his identity because he did such things as leaving his wallet and underwear at the scene of the murders, and after leaving the crime scene, he wandered across a public street covered in blood and with his penis exposed in full view of a police car.

I agree with Reeves that this evidence strongly suggests he did not "apparently" engage in an effort to conceal a crime or conceal his identity when he killed Lamm. *Reeves IV*, 871 F.Supp. at 1189 n. 8. However, if the evidence is viewed in the light most favorable to Respondent, a reasonable judge could have believed beyond a reasonable doubt that Reeves killed Lamm to conceal a crime, at least while he finished his assault on Mesner, and that he also killed Lamm to

conceal his identity. A reasonable judge might also conclude that Reeves was simply careless thereafter. This is a particularly plausible construction of the evidence given Reeves's significant impairment as a result of his use of drugs and alcohol. As a historical matter, this is precisely the construction the *Reeves I* court originally gave to the evidence regarding the sentencing panel's conclusion that this aggravator applied. *Reeves I,* 216 Neb. at 225–26, 344 N.W.2d at 446.

As a result, if Reeves's real argument is that the evidence does not support application of this aggravator, assuming the statute is limited by the language of *Holtan* and *Reeves II,* then I reiterate that federal law does not permit me to substitute my judgment for that of the *Reeves III* court. While I continue to have very serious reservations about applying this aggravating factor to Reeves, after viewing the evidence in the light most favorable to the prosecution, as I must according to *Lewis v. Jeffers,* 497 U.S. at 781, 110 S.Ct. at 3102–03, I find and conclude the record is sufficient to allow a reasonable sentencing judge to conclude beyond a reasonable doubt that Lamm's murder was for the "apparent" purpose of concealing Reeves's identity.

### H. Motion "to Keep the Record Open"

■ I turn lastly to Reeves's motion "to keep the record open" so that he might present evidence that he is "actually innocent." (Filing 144.) Reeves offers to prove through new medical evidence that he was insane at the time he committed the murders, and that his insanity was caused by a reaction to peyote and alcohol. (Filing 145.)

The *Reeves V* court made it clear that the remand to me was limited and that the court of appeals retained jurisdiction. *Reeves V,* 76 F.3d at 1431. Since the court of appeals has retained general jurisdiction of this case, I find and conclude that I lack the authority to consider Reeves's motion because it presents an issue unrelated to the remand.

### III. SUMMARY

It may be that Reeves should die for the awful crimes he committed. Six of the seven claims asserted here provide no reason to spare his life. But Reeves should not die unless and until his court-appointed lawyer has had a fair opportunity to plead for his life prior to the imposition of sentence. Since Reeves's able lawyer has not had this chance, I will grant relief on claim 34.[18]

Accordingly,

IT IS ORDERED that:

(1) Upon this court's acquiring jurisdiction from the United States Court of Appeals for the Eighth Circuit, judgment shall be entered in substance as follows:

Judgment is entered:

(a) For Petitioner and against Respondent on claim 34, ordering that the writ of habeas corpus shall issue and Petitioner shall be resentenced to life in prison unless, within sixty (60) days of the entry of judgment, the State of Nebraska initiates resentencing proceedings consistent with state law;

(b) Claims 5, 6, 26, 27, 36, and 38 are dismissed with prejudice;

(c) The prior judgment of this court is amended accordingly.

(2) The motion and supporting affidavit to "keep the record open" (filings 144, 145) are denied without prejudice;

(3) The Clerk of the United States District Court for the District of Nebraska shall promptly forward a copy of this memorandum and order to the Clerk of the United States Court of Appeals for the Eighth Circuit for submission to the judges who are considering this case.[19]

---

18. Because I am uncertain about the extent to which I retain the power to enter judgment in this case given that the court of appeals has retained jurisdiction, I shall not do so. However, I shall enter an order which I intend to be final.

19. Herewith delivered to the Clerk of the United States District Court are three boxes of state

court records (court files, exhibits, transcripts, briefs, presentence report and the like) delivered to my chambers by the Clerk after the remand by the Court of Appeals. I note that according to the markings on the boxes these records were at one time maintained in four boxes. However, only three boxes were delivered to me. Accordingly, I return only three boxes to the Clerk. Also returned to the Clerk are the exhibits received in evidence in this court at the evidentiary hearings conducted in February and March of this year and the blue binder which comprises a part of filing 71.